369 So.2d 1204 (1979)
Jimmy Davis ALLUMS, Plaintiff-Appellee,
v.
DIXIE METALS COMPANY, Defendant-Appellant.
No. 13827.
Court of Appeal of Louisiana, Second Circuit.
March 26, 1979.
*1205 Mayer, Smith & Roberts by Walter O. Hunter, Jr., Shreveport, for defendant-appellant.
Fish & Montgomery by John W. Montgomery and Bruce M. Bolin, Minden, for plaintiff-appellee.
Before HALL, MARVIN and JONES, J J.
HALL, Judge.
Defendants, Dixie Metals Company and its insurer, Travelers Insurance Company, appeal from a judgment finding plaintiff, Jimmy Davis Allums, totally and permanently disabled as a result of lead poisoning incurred while employed at defendant's factory and ordering them to pay appropriate workmen's compensation benefits, penalties and attorney's fees. For the reasons expressed by the trial court in its written reasons for judgment and the reasons expressed below, we amend the judgment to increase the award of attorney's fees and otherwise affirm.
Defendants contend the trial court erred in the following seven respects by:
(1) Determining plaintiff's physical condition is the result of an occupational disease;
(2) Determining plaintiff is totally and permanently disabled;
(3) Excluding the results of blood tests administered to plaintiff during his employment;
(4) Excluding the majority of Dr. Donald R. Lynam's testimony;
(5) Not requiring plaintiff to prove his case by an overwhelming preponderance of the evidence;
(6) Assessing defendants with statutory penalties and attorney's fees; and
(7) Ordering weekly compensation benefits to begin on October 5, 1976, rather than after demand was made in June, 1977.
Plaintiff answered defendants' appeal requesting an increase in attorney's fees from $3,000 to $4,000.
Defendant recycles old batteries into nearly pure lead. First, the tops of the batteries are cut off and the plates are removed and smelted in a furnace. The smelting removes a substantial amount of the nonlead material. The resulting lead is placed in a 60-ton kettle, "lead pot", where the lead is melted and the residual impurities are removed. The impurities are skimmed off the top of the molten lead by workmen using shovels. The lead is brought up to chemical specification and then poured into molds in preparation for delivery to the purchaser. The vapors and smoke from the furnace are routed through the "baghouse" where a succession of bags filter it to collect the flue dust. There is no filtering device for the lead pot. Flue dust contains lead. The evidence established flue dust was prevalent throughout the factory and was on the floor, water fountains, workers' clothes and skin, and in the air.
*1206 Defendant recognizes the hazards of this recycling operation and takes many safety precautions. It requires the use of respirators by all employees with filter changes as needed, issues special clothing not to be removed from the plant, specially instructs employees concerning eating, drinking and smoking while on the job and requires bathing before leaving the premises. Defendant also administers blood tests on all of its employees periodically. Those with too high serum lead level and those whose serum lead level has significantly increased over the last test are reinstructed in the use of safety equipment and procedures or removed from the lead-laden environment altogether until their serum lead level returns to normal.
Plaintiff has been employed as a manual laborer in various jobs since he was 14. According to all the evidence, including testimony by defendant's employees, he was an excellent worker. Plaintiff was employed by defendant for a little over two years from June 10, 1974, until October 4, 1976. However, he only actually worked for approximately 12½ months of this period in three different segments because of a cervical neck injury he suffered while on the job which eventually required a cervical fusion.
Plaintiff first worked as a maintenance man for defendant. His responsibilities took him to all parts of the factory. On returning to work after his cervical fusion, plaintiff worked first in the baghouse and then skimming slag from the lead pot. Plaintiff finally left the employ of defendant because of a pay dispute. It is uncontradicted that plaintiff felt weak and was suffering some weight loss when he left and that he made no complaints in this respect to defendant.
Plaintiff, concerned about his weight loss, initially went to his family physician, Dr. Sidney Pittman. Dr. Pittman referred plaintiff to Dr. William R. Giddens in Shreveport who in turn referred plaintiff to Dr. Michael O. Fleming of the Family Service Clinic of the LSU Medical School because of the reduced cost.
Dr. Fleming saw plaintiff on February 1, 1977. At that time he noticed plaintiff was suffering from symmetrical atrophy of the lower extremities, a loss of strength and endurance, but not sensation, and foot drop. On finding that defendant worked at a battery recycling factory, he arranged to have several tests administered. The blood test showed a serum lead level of 54 micrograms percent in plaintiff's blood. Normal level for an industrial worker is around 60 micrograms percent. Dr. Fleming also administered a provocative test to determine the amount of lead in plaintiff's body. This test consists of administering doses of penicillamine, a chelating agent designed to leach the lead out of the bones where the body stores it, and then taking a 24-hour urine sample. Plaintiff's urinary lead was 118 micrograms per liter. Ten micrograms per liter is considered normal. Also, plaintiff's serum lead level rose to 152 micrograms percent.
Dr. Fleming testified that initially the lead is absorbed into the blood and soft tissues, but at some point it becomes excessive and then is absorbed and stored in the bone in an inert form. The absorption rate is approximately ten times faster than the excretion rate, therefore, there is a build-up of lead in the bones. Based on the symptoms and the high amount of lead in the body of plaintiff, Dr. Fleming concluded plaintiff had suffered lead poisoning which resulted in lead neuropathy, a dissolution of the segments of the sheath surrounding the nerves so that the nerves can no longer transmit impulses. This lead neuropathy caused the symptoms mentioned above. Dr. Fleming administered penicillamine for three and one-half months in an attempt to remove the lead from plaintiff's body and prescribed a physical therapy regime.
Dr. Fleming's supervisor, Dr. Charles Sias, concurred in the diagnosis. Dr. Fleming and Dr. Sias were also of the opinion plaintiff has reached maximum improvement at this time and that he will never be able to hold any employment requiring endurance, strength, bending or squatting, that is, employment involving manual labor.
*1207 Dr. Fleming testified that in his opinion the lead poisoning resulted directly from plaintiff's employment at defendant's factory.
The lay testimony shows conclusively that plaintiff had always been a healthy, active, hardworking individual. Defendant readily admits it was quite pleased with plaintiff's performance as a worker. Upon plaintiff's return to work after recovering from his cervical fusion, his health, strength and endurance began to steadily decline. This process continued and became acute after he ceased his employment in October, 1976. The lay testimony shows that plaintiff cannot sit in one place for a long time, that his legs constantly cramp, and that he cannot now perform simple tasks around the house such as mowing the grass and minor home repairs.
Considering these facts, we find the trial court was correct in finding plaintiff was suffering from an occupational disease which has totally and permanently disabled him. Thus, defendants' first, second and seventh specifications of error are without merit.
Defendants' medical evidence consisted of a report by Dr. H. Winston Brown who saw plaintiff only once after nearly a year of treatment and physical therapy. The report was admitted into evidence by stipulation in lieu of the doctor's testimony. His report concluded "his symptoms suggest that he has depression and if such is the case, precisely how much of the problem can be attributed to lead toxicity as opposed to other factors seems indefinite, and difficult or impossible to determine." He also said "his present examination reveals no deficit of strength or sensation in the lower extremities. If he has had a peripheral neuropathy due to lead toxicity, the condition seems to have improved to the point that it is not presently clinically detectable." Dr. Brown does not deny plaintiff could have had lead poisoning. The trial court found that his inconclusiveness as to plaintiff's problem could have easily resulted from the fact plaintiff had been under physical therapy for nearly a year and had reached his level of maximum improvement The deterioration of plaintiff's condition would easily explain any depression. Dr. Brown's report is inconclusive.
Defendants also sought to offer into evidence the results of five blood tests performed by defendant on the plaintiff during his employment. The blood samples were drawn by a nurse and then sent out of state to a certified testing laboratory that returned the results to defendant. There was no evidence of the laboratory's handling procedures of the samples or their testing techniques and no way for plaintiff to cross-examine the persons performing the tests or probe the accuracy of the results of the tests. This evidence was correctly excluded. Defendants' third specification of error is without merit.
Defendants assert the trial court erred in excluding the testimony of their expert, Dr. Lynam, whose testimony is included in the record as an offer of proof. He is an expert in environmental health research and is particularly qualified in the area of heavy metals in industry. He is also manager of the Environmental Health Department of the International Lead-Zinc Research Organization. Whether the exclusion was proper is an extremely close question. The trial judge excluded the testimony because defendants indicated they would try and elicit a clearly inadmissible medical opinion from Dr. Lynam. This court's analysis of the offer of proof concludes his testimony only concerned the toxic effects of a given serum lead level on the human system in general, testimony we feel he was qualified to give. We, therefore, considered the offer of proof.
Basically, Dr. Lynam testified that if plaintiff had lead poisoning, at some point he would have exhibited a high serum lead level. His testimony is entitled to little weight in the ultimate determination of whether plaintiff suffered lead poisoning. He never examined plaintiff and admittedly is unqualified to diagnose his condition. He admitted it was possible, but not likely, that a person could incur lead poisoning even though his serum lead level was within acceptable *1208 levels. Also, there is no admissible evidence in the record of plaintiff's serum lead levels during his employment. In the face of Dr. Fleming's testimony and diagnosis and plaintiff's symptoms, we find the consideration of Dr. Lynam's testimony does not alter the judgment of the trial court.
Defendants also argue that LSA-R.S. 23:1031.1(D) requires plaintiff to prove the disease was contracted in the course of his employment by an overwhelming preponderance of the evidence because he had not been actively working for defendant for a continuous 12-month period. Assuming, arguendo, the correctness of defendants' position, we find plaintiff has met his burden of proof by an overwhelming preponderance of the evidence.
The trial court also awarded plaintiff penalties and attorney's fees for defendants' arbitrary refusal to pay benefits without probable cause. The defendants cite plaintiff's lack of complaint during the latter stages of employment, the termination of his employment due to pay difficulties, and the records of the results of his blood tests as being sufficient reason to refuse to pay compensation. Defendants admittedly received on June 2, 1976, demand for payment and proof of the claim relating Dr. Fleming's diagnosis of "heavy metal poisoning" caused by plaintiff's employment in defendant's plant. When faced with this medical diagnosis, defendants were not reasonable in relying on their own conclusions drawn from the reasons stated above to refuse compensation. We, therefore, affirm the trial court's award of penalties.
Plaintiff answered the appeal seeking an increase in the trial court's award of attorney's fees from $3,000 to $4,000 and an award for future medical expenses. We increase the award of attorney's fees from $3,000 to $4,000 because of the additional services rendered in connection with the appeal. Plaintiff is not entitled to an award for future medical expenses under the Workmen's Compensation Law. There is no liability for medical expenses until they are incurred. The right to assert a claim for future medical expenses is always reserved to the plaintiff and need not be specifically reserved in the judgment. Deshotels v. Fidelity and Casualty Co. of New York, 324 So.2d 895 (La.App. 3d Cir. 1975), writs denied 328 So.2d 376 (La. 1976).
The district court judgment is amended to increase the attorney's fees awarded from $3,000 to $4,000 and, as amended, is affirmed at defendants' costs.
Amended, and as amended, affirmed.