**Laural Lee COZINE, Plaintiff and Appellant,**

v.

**MIDWEST COAST TRANSPORT, INC., Defendant and Appellee.**

Nos. 16726, 16737.

Supreme Court of South Dakota.

Argued Feb. 12, 1990.

Decided April 18, 1990.

N. Dean Nasser, Jr., of Nasser Law Offices, P.C., Sioux Falls, for plaintiff and appellant.

G. Kevin Kane of May, Johnson, Doyle & Becker, P.C., Sioux Falls, for defendant and appellee.

SABERS, Justice.

Laural Lee Cozine appeals her award of worker's compensation benefits, claiming the benefits awarded are inadequate. By notice of review, Cozine's employer, Midwest Coast Transport (Midwest), claims that some of the compensation benefits are excessive.

## Facts

Cozine was employed as a truck driver for Midwest and was in Salem, Oregon on October 13, 1981, when she injured herself in the course of her employment. The injury occurred when she caught her hand in the latch of a semi-trailer door. Cozine consulted a doctor in Oregon, who took X-rays, but could find no abnormalities. He advised Cozine to consult an orthopedic surgeon or neurologist upon her return to South Dakota.

After returning to South Dakota, Cozine contacted Judy Spilde, Midwest's worker's compensation claim examiner, and on several occasions requested permission to select her own physician. Spilde informed Cozine that Central Plains Clinic (CPC) in Sioux Falls was the only authorized medical provider for employees of Midwest and she would have to receive treatment there. Cozine was informed that she had the right to select her own physician, but if she did, her medical expenses would not be covered. Consequently, Cozine went to CPC for treatment.

Cozine first sought treatment at CPC on November 3, 1981, when she saw Dr. Tam. Dr. Tam took X-rays, but could not find anything wrong at that time. Nevertheless, Cozine was placed on temporary, total disability beginning November 3, 1981. She saw Dr. Tam again on two occasions in December 1981 and continued to complain of pain in her hand and an inability to fully use the hand. Dr. Tam was unable to find a cause for Cozine's problem and referred her to Dr. Larke, an orthopedic surgeon at CPC. Dr. Larke first saw Cozine on December 23, 1981, and prescribed an extensive physical therapy program.

In mid-January of 1982, Spilde contacted Drs. Tam and Larke, seeking a report on Cozine's condition. After receiving a letter from Dr. Tam and talking to him on the phone, Spilde decided that Cozine was no longer disabled as a result of her injuries and sent a letter to Cozine instructing her to return to work.[1] The letter stated that Midwest would be "unable to continue compensation benefits." A few days after sending the letter to Cozine, Spilde received a letter from Dr. Larke stating that Cozine was presently disabled from driving her truck and he did not know when she would be able to return to work. In spite of this letter, Spilde did not change her determination that Cozine should return to work, and she did not inform Cozine of Dr. Larke's opinion. Instead, she let stand her letter to Cozine that stated that both Drs. Tam and Larke had concluded that Cozine was "no longer disabled as a result of [her] injury and that there [was] nothing physically wrong with [her] hand."[2] As a result, Midwest terminated payment of temporary, total disability benefits on January 26, 1982.

On February 3, 1982, Cozine contacted Dr. Rhoades, an orthopedic surgeon, for treatment. Dr. Rhoades concluded that there was probably some limitation of the use of the hand for Cozine's type of employment, but he suggested "continued use of the hand with activities as tolerated." About February 4, 1982, Cozine consulted another orthopedic surgeon, Dr. Lewis. After that initial visit, Dr. Lewis contacted Midwest for approval of medical treatment. Dr. Lewis was informed that CPC was the only authorized medical provider for Midwest; he may have informed Cozine of that fact. Cozine continued to see Dr. Lewis through May 1982. During that same period she also contacted Dr. Merkwan, a chiropractor, and received additional treatment from him.

In August 1982, Cozine contacted yet another doctor, Dr. Van Demark, Jr. Dr. Van Demark eventually referred Cozine to the Mayo Clinic in Rochester, Minnesota. Cozine first obtained treatment at the Mayo Clinic in December of 1982 under the care of Dr. Dobyns. She returned to the Mayo Clinic for treatment several times over the next year and one-half. On July 28, 1983, Dr. Dobyns sent a letter to Cozine's counsel stating a prognosis that Cozine had a permanent, partial impairment of

1. Dr. Tam denies that he told Spilde that Cozine was not disabled.

2. Spilde restated this position in a March 18, 1982, letter to Cozine's attorney.

approximately twenty percent of the right upper limb and that she was unlikely to improve. However, treatment did continue. In 1984, the Mayo Clinic performed a procedure on Cozine's elbow called cryoanalgesia. As a result of this procedure, Cozine's condition worsened.

In August of 1984, Cozine returned to CPC for treatment when Midwest's counsel informed her that she could return. Cozine eventually came under the care of Dr. Opheim. He referred Cozine to Dr. Erickson at the University of Minnesota Hospital for ulnar nerve surgery in February of 1985. After the surgery, Cozine's condition returned to the condition before the cryoanalgesia procedure in the summer of 1984.

While undergoing her various medical treatment, Cozine pursued a college education. She returned to college at the University of South Dakota at Springfield in January of 1982 and graduated in June 1984 with a degree in machine tool and drafting. In the fall of 1984, Cozine enrolled at Mankato State University to obtain a master's degree in industrial and technical studies. In June 1984, Cozine filed a claim with Midwest requesting rehabilitation benefits for her education. Midwest denied the claim.

Cozine petitioned the Department of Labor for a hearing regarding her claim for worker's compensation benefits. On May 29, 1986, Cozine was paid permanent, partial disability benefits for 15% of the right arm based upon Dr. Erickson's 15% impairment rating. The hearing was held in October 1986. At the hearing, Cozine sought to introduce the testimony of a vocational expert regarding Cozine's loss of employability as evidence of her permanent, partial disability. The hearing examiner refused the testimony because she did "not believe that that is relevant under the statutes as they are interpreted by the Department." The vocational expert then testified as an offer of proof that Cozine's injury would produce a sixty-eight percent reduction in employability following rehabilitation.

A decision in the case was issued on June 18, 1987. The hearing examiner:

1) denied any additional permanent, partial disability benefits;

2) awarded additional temporary, total disability benefits from January 26, 1982, to February 4, 1982;

3) denied rehabilitation benefits;

4) denied attorney fees;

5) awarded temporary, partial disability benefits from February 4, 1982, to July 28, 1983; and

6) denied medical expenses incurred outside CPC.

Cozine appealed to circuit court. A hearing was held on October 26, 1987, and the court issued its findings of fact and conclusions of law on February 27, 1989. The circuit court affirmed the decision of the hearing examiner except for reversing the denial of medical expenses. Cozine appeals issues 1 through 4, and Midwest appeals on issues 5 and 6. We affirm all issues except that we reverse and remand on issues 1, 4, and the second part of issue 2.

### Standard of review.

■ In reviewing a decision of an administrative agency, our standard of review is the same as the circuit court. We determine whether the agency's findings of fact are clearly erroneous and whether the law has been correctly applied. *Barkdull v. Homestake Mining Co.*, 317 N.W.2d 417 (S.D.1982) (*Barkdull I*). Our review of the circuit court's decision is without any presumption that its decision was correct. *Id.*

### 1. *Permanent, partial disability benefits.*

■ Cozine claims the Department of Labor hearing examiner erred when she let stand the permanent, partial impairment rating of a doctor as the sole measure of Cozine's loss of use of her arm or whole person. SDCL 62–4–6 specifies the amount of compensation an employee shall receive for the loss of a part of the body or its loss of use. The clear language of this statute directs that compensation shall be paid for loss of use. Consequently, the hearing examiner must determine if, and to what extent, a claimant has suffered the loss of

use of a part of the body. This determination requires more than a mere adoption of a medical evaluation of anatomical impairment.

A medical impairment rating will not always measure loss of use. This concept was well explained in *Boyce v. Sambo's Restaurant, Inc.*, 44 Or.App. 305, 308, 605 P.2d 1213, 1214 (1980) (quoting referee's decision):

> After giving consideration to all the evidence, I conclude this is another case where the scientific measurement of impairment does not adequately measure the disability. It doesn't do a man much good to have a thumb with an excellent range of motion if he isn't able to use it for anything except the lightest of activities.[3]

Although the medical impairment rating given by a doctor is an important factor, the extent of loss of use does not necessarily equal the extent of medical impairment. *Id.*[4] Indeed, the American Medical Association, *Guide to the Evaluation of Permanent Impairment*, x (2d ed. 1984), explains the limited nature of an impairment rating:

> The physician who makes a determination about impairment must keep in mind that a permanent impairment rating is not the same as a disability rating. Permanent medical impairment is related directly to the health status of the individual, whereas disability can be determined only within the context of the personal, social, or occupational demands, or statutory or regulatory requirements that the individual is unable to meet as a result of the impairment.

A medical impairment rating simply is not intended to measure loss of use.

It is the responsibility of a hearing examiner to determine a claimant's loss of use based upon the evidence as a whole. Here, the hearing examiner improperly refused to consider evidence other than a medical impairment rating. In her memorandum decision, the hearing examiner concluded that Cozine's permanent, partial disability benefits would be based upon the "permanent physical impairment rating provided by Dr. Dobyns." She supported her decision, without citing any authority, by stating that:

> This jurisdiction has not recognized factors other than the permanent physical impairment rating given by the physician in determining the amount of permanent partial disability benefits.

This conclusion is an incorrect statement of the law of this state. The hearing examiner should have considered other evidence, such as the testimony of Cozine's vocational expert regarding loss of employability and the deposition testimony of Dr. Opheim that "any activity that would involve use of [Cozine's] right upper extremity she would be unable to do." Without considering such evidence, the hearing examiner could not properly fulfill her responsibility to determine Cozine's loss of use. Therefore, we reverse and remand for such a determination.

**2. *Temporary, total disability benefits.***

■ *First.* The hearing examiner awarded Cozine additional temporary, total disability benefits from January 26, 1982, to February 4, 1982. Cozine claims she is entitled to temporary, total disability benefits beyond February 4, 1982, to the present. The hearing examiner determined that after that date Cozine was only entitled to temporary, partial disability bene-

---

**3.** The Oregon Workers' Compensation statute provides permanent, partial disability compensation for "complete or partial loss of use." Or.Rev.Stat. § 656.214 (1989).

**4.** Other courts have reached the same conclusion. *See, e.g., Gly Constr. Co. v. Davis*, 60 Md.App. 602, 483 A.2d 1330 (1984) (Proper to consider evidence in addition to medical reports when determining the extent of loss of use), *cert. denied*, 302 Md. 288, 487 A.2d 292 (1985); *Forest Products, Div. of the Ludlow Corp. v.*

*Collins*, 534 S.W.2d 306, 309 (Tenn.1976) ("In determining the amount of disability suffered by an injured employee, the trial court considers all the evidence and is not restricted to the precise estimate of disability made by a medical witness."); *McManus v. Southern United Ice Co.*, 243 Miss. 576, 138 So.2d 899 (1962) (Whether the loss of use of an arm was a total loss of use or a partial loss of use could be determined from the evidence as a whole).

fits. SDCL 62–4–5 provides that if an employee "has been released by his physician from temporary total disability and has not been given a rating to which § 62–4–6 would apply, he shall receive compensation" based upon the amount of earnings the employee is able to earn. The hearing examiner found that as of February 4, 1982, Cozine's physicians released her to return to employment with restrictions. Although none of Cozine's physicians explicitly stated that she was released from temporary, total disability, we cannot say that the hearing examiner was clearly erroneous in giving that effect to the opinions and statements of her physicians. While all of the physicians were of the opinion that Cozine could not return to her truck driving job, they generally encouraged limited use of the injured arm and placed no restrictions upon the use of the rest of her body. Therefore, the hearing examiner was not clearly erroneous in starting temporary, partial disability benefits on February 5, 1982.

■ *Second.* In the alternative, Cozine makes a specific claim for temporary, total disability benefits during the time her condition was aggravated due to the cryoanalgesia procedure. The hearing examiner denied such benefits "on the basis that such treatment was necessitated by unauthorized medical care at Mayo Clinic." The circuit court found the Mayo Clinic medical care authorized and reversed the denial of medical expenses. Since the hearing examiner erred in finding the medical care at Mayo Clinic unauthorized (*see* Issue 6, *infra*), we remand to determine whether Cozine is entitled to such benefits during the period in question.

The aggravation of an injury by medical or surgical treatment is compensable under worker's compensation law. *Hanson v.*

*Penrod Constr. Co.,* 425 N.W.2d 396 (S.D. 1988). This is true even if "the physician or surgeon has been selected by the employee, provided the employee was justified in making his own selection of the physician or surgeon by the failure of the employer to comply with the provisions of [the worker's compensation statute] in providing proper medical care." *Forest Products, supra* at 309; *see also Wilson v. Emery Bird Thayer Co.,* 403 S.W.2d 953 (Mo.Ct.App.1966). Since Cozine was justified in selecting her own physician, she is entitled to benefits if she was disabled by the cryoanalgesia procedure.

### 3. *Rehabilitation benefits.*

■ Cozine claims the hearing examiner was clearly erroneous in finding that rehabilitation was not necessary to return Cozine to suitable, substantial, and gainful employment, and that the education undertaken by Cozine was not a reasonable program of rehabilitation. Whether an injured employee is entitled to rehabilitation benefits is governed by SDCL 62–4–5.1.[5] The statute establishes five requirements an injured employee must meet before receiving rehabilitation benefits:

1.  The employee must be unable to return to his usual and customary line of employment;

2.  Rehabilitation must be necessary to restore the employee to suitable, substantial, and gainful employment;

3.  The program of rehabilitation must be a reasonable means of restoring the employee to employment;

4.  The employee must file a claim with his employer requesting the benefits; and

5.  The employee must actually pursue the reasonable program of rehabilitation.

5.  SDCL 62–4–5.1 provides:

    An employee who suffers disablement as defined by subdivision (2) of § 62–8–1 or an injury, and is unable to return to his usual and customary line of employment, shall receive compensation at the rate provided by § 62–4–3 up to sixty days from the finding of an ascertainable loss, provided the employee is pursuing a course of rehabilitation and during the period he is engaged in a program

of rehabilitation which is reasonably necessary to restore the employee to suitable, substantial and gainful employment. The employee shall file a claim with his employer requesting such compensation and the employer shall follow the procedure specified in chapter 62–6 for the reporting of injuries when handling such claim. If the claim is denied, the employee may petition for a hearing before the department.

Cozine meets the first requirement because it is undisputed that she is unable to return to her usual line of employment as a truck driver. As to the second requirement, Cozine offered extensive testimony and evidence that she was unable to obtain employment following her injury. Midwest argues that there are jobs Cozine theoretically would be able to perform. However, they have offered no evidence that any such position would regularly and continuously be available to Cozine, nor that such a position would restore her to *suitable* employment. The statute requires more than the mere restoration to employment. The new employment must be suitable when compared to the employee's former job. Just as with the odd-lot test determination of total disability, once an employee has made a prima facie showing that she is unable to find suitable employment, the employer then has the burden of establishing that the employee would be capable of finding such employment without rehabilitation. *See Wendel v. Domestic Seed & Supply*, 446 N.W.2d 265 (S.D. 1989). Cozine made the necessary prima facie showing and Midwest then failed to meet its burden. The hearing examiner was clearly erroneous in determining that Cozine failed to meet the second requirement that rehabilitation is necessary.

■ Nevertheless, Cozine fails to satisfy the third requirement for rehabilitation benefits. The hearing examiner was not clearly erroneous in concluding that Cozine's four-year college program was not reasonably necessary for her rehabilitation. As we stated in *Barkdull v. Homestake Mining Co.*, 411 N.W.2d 408, 410 (S.D. 1987) (*Barkdull II*):

> The kind of rehabilitation program contemplated by SDCL 62–4–5.1 is that which enables the disabled employee to find suitable and gainful employment, not to elevate his station in life. An injured worker cannot insist upon a college education if other suitable employment opportunities exist which do not require college training.

Cozine bears the burden of establishing the reasonableness of her rehabilitation program, yet she has not demonstrated that the only suitable employment opportunities that are available to her require a college education. It is her right to seek a college education, but Midwest cannot be compelled to pay for such a program if it is not necessary.

### 4. *Attorney fees.*

SDCL 58–12–3 provides that attorney fees may be awarded to an employee if the employer "refused to pay the full amount of such loss, and that such refusal is vexatious or without reasonable cause." Since Midwest failed to pay the "full amount of such loss" in respect to Issues 5, 6, the first part of 2, and possibly Issue 1 and the second part of 2, we remand this issue for a determination whether such refusal was vexatious or without reasonable cause. SDCL 58–12–3 and SDCL 58–12–3.1.

### 5. *Temporary, partial disability benefits.*

■ Cozine was awarded temporary, partial disability benefits from February 5, 1982, through July 28, 1983. By notice of review, Midwest claims Cozine is not entitled thereto because they claim Cozine abandoned the labor market to return to college in January 1982. SDCL 62–4–5 provides compensation for temporary, partial disability based in part upon "the average amount which [employee] is earning or is able to earn in some suitable employment or business after the accident." Since the statute refers to the amount the employee is *able* to earn, Cozine satisfied her burden under the statute by introducing evidence of what she was able to earn as a part-time summer worker and a dormitory resident assistant during the period of temporary, partial disability. Midwest failed to present any evidence to establish that Cozine could have earned more. Instead, Midwest simply argues that the testimony of Cozine's vocational expert indicated that Cozine was physically capable of performing 200 jobs. However, physical capability does not equal earning capability. To counter Cozine's evidence, Midwest must demonstrate that higher earnings would be regularly and continuously available to Cozine. This they failed to do. Therefore, we cannot say that the hearing examiner was clearly erroneous in awarding temporary, partial disability benefits.

### 6. *Medical expenses.*

■ Midwest claims the circuit court erred in reversing the hearing examiner's decision that Cozine selected her own physicians at her own expense after January 29, 1982. SDCL 62–4–1 places an affirmative duty upon the employer to provide necessary medical care to an injured employee. As explained in 2 *Larson's Workmen's Compensation Law* § 61.12(d) at 10–817 (1989):

> It is usually held that when the employee has furnished the employer with the facts of his injury, it is up to the employer to instruct the employee on what to do to obtain medical attention, and to inform him regarding the medical and surgical aid to be furnished.

The letter from Midwest to Cozine, dated January 26, 1982, states that Midwest will not "continue compensation benefits." Midwest's letter of March 18, 1982, to Cozine's attorney states that "she is not entitled to further worker's compensation disability." The letter also states that it is the opinion of Midwest that there is nothing physically wrong with Cozine. Such conduct does not satisfy the employer's affirmative duty to provide medical treatment, and it was clearly erroneous for the hearing examiner to so decide. Although Cozine may have known that CPC was the only authorized medical provider, after receiving the January 26, 1982, letter from Midwest she had no reason to believe that the clinic was available to her. Midwest knew that Cozine needed additional treatment beyond January of 1982, yet the company failed to properly provide that treatment. Therefore, Cozine was within her rights to make suitable, independent arrangements at Midwest's expense. *Id.*, § 61.12(d) at 10–806.

We affirm all issues except that we reverse and remand on Issues 1, 4, and the second part of Issue 2.

All the Justices concur.