1996 SD 98

Janet K. TISCHLER, Claimant and Appellant,

v.

UNITED PARCEL SERVICE, Employer, Defendant and Appellee,

and

Liberty Mutual Insurance Group, Insurer, Defendant and Appellee,

and

City of Rapid City, South Dakota, Employer, Defendant and Appellee,

and

South Dakota Municipal League Worker Compensation Fund, Insurer, Defendant and Appellee.

Nos. 19481, 19494.

Supreme Court of South Dakota.

Considered on Briefs May 22, 1996.

Decided July 31, 1996.

Rehearing Denied Sept. 4, 1996.

Patricia A. Meyers of Costello, Porter, Hill, Heisterkamp & Bushnell, Rapid City, for appellant.

Susan Jansa Brunick and Lori Purcell Fossen of Davenport, Evans, Hurwitz & Smith, Sioux Falls, for appellees UPS and Liberty Mut. Ins.

Curtis S. Jensen of DeMersseman Jensen, Rapid City, for appellees City of Rapid City and S.D. Municipal League.

SABERS, Justice.

[¶ 1] Tischler appeals as inadequate her workers' compensation impairment rating, the chiropractic and medical expenses, and costs. UPS filed notice of review challenging liability, permanent partial disability benefits, prejudgment interest, penalty, and the finding that Tischler's condition was not aggravated during employment with Rapid City (City). We affirm all issues except that we reverse issue 8 (penalty), the second part of issue 5 (permanent partial disability benefits) and remand for recalculation that part of issue 7 on prejudgment interest.

## FACTS

[¶ 2] Tischler began her employment as a preloader with UPS on August 25, 1986. On December 8, 1986, Tischler reported an injury to her right hip. UPS sent her to its physician, Dr. Tschetter. She also sought treatment from Dr. Scherr, a chiropractor. Chiropractic expenses were paid by UPS' insurer until October 1987. Tischler continued treatment with Dr. Scherr because she was not satisfied with Dr. Tschetter.

[¶ 3] On December 23, 1988, Tischler was contacted by her supervisors and told she would be assigned to unload the following day due to seniority provisions in the union contract. Tischler thought she was being treated unfairly. She indicated that she could be hurt if she unloaded. One of her supervisors worked beside her during the unload shift and trained her in safe work methods. She claims she was injured and shouted to her supervisor to let him know, but does not know if he heard her. She reported the injury to another supervisor.

[¶ 4] On the next scheduled work day, December 28, 1988, Tischler worked preloading. She complained of back and hip pain and another accident report was filled out. She attended a back clinic and was released to work upon completion of her treatment. Although encouraged not to, Tischler continued to receive chiropractic treatments while attending the back clinic.

[¶ 5] Upon return to work, Tischler complained of back and hip pain. Dr. Tschetter referred her to Dr. James, a neurologist, who diagnosed chronic lumbosacral sprain-strain aggravated by work. He recommended a change of occupation.

[¶ 6] On February 13, 1989, Dr. Tschetter indicated Tischler only had a subjective complaint of chronic pain which he did not think was a "compensatable" problem. He recommended that Tischler either continue with her job and bear the discomfort or find a more suitable job.

[¶ 7] Tischler was sent to Dr. Wessel, a family practice physician, who diagnosed right sacroiliac pain of uncertain origin. Dr. Wessel allowed Tischler to return to work to see how she progressed. After nine days of work in March 1989, Tischler was taken off work because of continuing problems. Tischler has not returned to UPS since that date.

[¶ 8] Tischler obtained temporary employment with City from March 1989 until October 1989. On April 6, 1990, Tischler became permanently employed for City as an ordinance officer.

[¶ 9] In 1989, Dr. Scherr referred Tischler to Dr. Berkebile, an orthopedic surgeon. In August 1990, Dr. Scherr felt Tischler had achieved maximum medical improvement and assigned a 10% impairment rating. Tischler continued to see Dr. Scherr one to two times per week.

[¶ 10] In January 1991, Tischler was involved in an automobile accident in the course of her work for City. She suffered a neck injury and exacerbation of her back problems, which were treated by Dr. Scherr. He later testified that Tischler's back injury returned to its pre-accident condition by August 1991 and that her neck injury achieved maximum medical improvement within twelve to eighteen months after the accident. City's insurer paid Dr. Scherr's bills until January 1992.

[¶ 11] The Department of Labor (Department) ruled that Tischler's car accident did not independently contribute to the final disability of her back and that City's insurer was not liable for the back injury, except temporary treatment.

[¶ 12] City referred Tischler to Dr. Tschida, a neurologist, in March 1992. Dr. Tschida felt Tischler had achieved maximum medical improvement. He indicated that continued chiropractic therapy on such a frequent basis for so many years was excessive. Dr. Tschida assigned a 7% impairment rating to Tischler's back.

[¶ 13] Dr. Scherr referred Tischler to Dr. Blume, a neurologist, Dr. Goff, a physiatrist, and Dr. Sabow, a neurologist, and Tischler continued to see Dr. Scherr two times per week through the date of the hearing. Dr. Scherr's treatment was reviewed by the Chiropractic Peer Review Committee of the South Dakota Board of Chiropractic Examiners (Committee). The Committee found that Dr. Scherr's records lacked objective findings to support Scherr's excessive treatments and that such frequent treatment promoted dependency.[1]

[¶ 14] William Peniston, a vocational rehabilitation counselor, determined Tischler suffered a 77% loss of access to the job market and no loss of earning ability. He purported to give each factor equal weight and averaged the two for a "vocational" disability of 39%.

[¶ 15] The Department determined that Tischler suffered an injury in the course of her employment with UPS on December 24, 1988, and was entitled to temporary total disability benefits while medically released from work through March 9, 1989.

[¶ 16] The Department determined Tischler was entitled to permanent partial disability benefits based on a 7% impairment rating by Dr. Tschida. The Department also determined Tischler suffered a 39% loss of use. The Department added the two percentages and awarded permanent partial disability benefits of 46%.

[¶ 17] The Department adopted the Committee's recommendations for payment of the chiropractic expenses. The Department held City's insurer fully met its obligation for payment of chiropractic charges and stated that "[b]ased upon the findings of the Peer Review Committee all [unpaid] charges are excessive."

[¶ 18] Tischler requested prejudgment interest, penalty, and costs. The Department awarded prejudgment interest for permanent partial disability beginning April 4, 1992, the date Dr. Tschida assigned the 7% permanent partial disability rating. The Department awarded prejudgment interest for loss of use from March 3, 1993, the date of the 39% rating. The Department denied penalty and costs.

---

1. The Committee recommended full payment of Dr. Scherr's services through August 21, 1987; found no documentation to support services between August 21, 1987 and January 18, 1988; recommended full payment for December 28, 1988 through April 7, 1989, payment of two visits per month from April 1989 through March 1990, payment of one visit per month from April 1990 through January 1991; and recommended payment for all services from January 30, 1991 through April 30, 1991. The Committee recommended no payment for treatments after April 30, 1991.

[¶ 19] The circuit court affirmed the Department's findings of fact, but remanded to the Department to determine whether payment was required for the medical bills from Dr. Berkebile, Dr. Blume and Dr. Sabow. The circuit court reversed the Department's denial of a penalty under SDCL 62–4–10.1.

[¶ 20] Tischler and UPS appeal.

## Standard of Review

[¶ 21] Tischler claims a different standard of review applies when the administrative law judge who heard the case and wrote the memorandum decision did not write the findings of fact and conclusions of law. The memorandum decision was written September 23, 1994, by Administrative Law Judge (ALJ) Jean Koehler. The findings of fact and conclusions of law were written October 21, 1994, by ALJ Ryan Darling. Tischler urges this court to review all issues de novo, claiming we are in the same position as the administrative law judge who wrote the findings of fact and conclusions of law.

[¶ 22] Tischler claims Koehler's memorandum decision is not binding on the parties. In this case, the findings of fact and conclusions of law state: "The Memorandum Decision of the Department of Labor is incorporated herein as if set forth in full. If there is a conflict between the Memorandum Decision [and] the Findings of Fact and Conclusions of Law, the Memorandum Decision controls." Tischler has not pointed to any conflicts between the memorandum decision and the findings of fact and conclusions of law. Therefore, we decline to adopt Tischler's suggested de novo standard of review for all issues.

[¶ 23] The circuit court's review and our review of the agency's actions are controlled by SDCL 1–26–36. Under this statute our standard of review will vary depending on whether the issue is one of fact or one of law. When the issue is a question of fact, then the actions of the agency are judged by the clearly erroneous standard; and when the issue is a question of law, then the actions of the agency are fully reviewable. *Permann v. Dept. of Labor, Unemp. Ins. D.*, 411 N.W.2d 113 (S.D. 1987); *Egemo v. Flores*, 470 N.W.2d 817 (S.D.1991). However, when the evidence on an issue of fact is submitted to the agency *entirely* by deposition, then our review of that evidence is unhampered by the clearly erroneous rule. *Lien v. Miracle Span Corp.*, 456 N.W.2d 563 (S.D.1990); *Application of Northwestern Bell Tel. Co.*, 382 N.W.2d 413 (S.D.1986); *Harden v. South Dakota Credit Union League, Inc.*, 87 S.D. 433, 209 N.W.2d 665 (1973). This means that we will decide for ourselves the credibility of the deponents and the weight and value to be attached to their testimony.

*Caldwell v. John Morrell & Co.*, 489 N.W.2d 353, 357 (S.D.1992). We review to determine whether the record contains substantial evidence to support the agency's determination. *Helms v. Lynn's, Inc.*, 1996 SD 8, ¶ 10, 542 N.W.2d 764, 766 (citations omitted).

[¶ 24] **1. Whether Tischler proved she suffered a compensable injury in December 1988.**

[¶ 25] UPS claims Tischler did not prove she suffered a compensable injury in December 1988. "In a worker's compensation case, the claimant has the burden of proving all the facts essential to compensation." *Day v. John Morrell & Co.*, 490 N.W.2d 720, 724 (S.D.1992) (citing *King v. Johnson Bros. Constr. Co.*, 83 S.D. 69, 155 N.W.2d 183 (1967); *Mehlum v. Nunda Coop. Ass'n*, 74 S.D. 545, 56 N.W.2d 282 (1952)).

[¶ 26] Tischler reported injuries on December 24 and 28, 1988. UPS argues there is no medical evidence that any actual injury occurred. The Department held that Tischler proved "through competent medical evidence that she suffered an injury arising out of and in the course of her employment with UPS on December 24, 1988."

[¶ 27] The requirement that an employee prove causation "does not mean that the employee must prove that his employment was the proximate, direct, or sole cause of his injury; rather, the employee must show that his employment was 'a contributing factor' to his injury." *Caldwell*, 489 N.W.2d at 358 (quoting *Sudrla v. Commercial Asphalt and Materials*, 465 N.W.2d 620,

621 (S.D.1991); *King*, 83 S.D. 69, 155 N.W.2d 183).

> This Court has previously recognized in other cases that an employee does not have to have an accident or experience any trauma to his person before a medical condition will qualify as a compensable injury. It is sufficient that the disability "was brought on by strain or overexertion incident to the employment, though the exertion or strain need not be unusual or other than that occurring in the normal course of employment".... Thus, the issue in this case is whether Employee's back condition was caused by the strain of the manual labor he performed for Employers.

*Id.* (quoting *Sudrla*, 465 N.W.2d at 621). *Schuck v. John Morrell & Company*, 529 N.W.2d 894 (S.D.1995), involved an employee who could not "relate a specific time or incident which caused his disability," but claimed the cumulative effect of repetitive work caused his back injury. *Schuck*, 529 N.W.2d at 899. The record showed the employee was involved in heavy lifting on a daily basis. We held the Department erred in finding no causal connection between the employee's employment and his injuries. *Id.*

[¶ 28] Likewise, here, the Department found the medical evidence supports a causal relationship between Tischler's complaints and her employment, stating:

> Although several doctors were involved in [Tischler's] care over the years, few were asked to express an opinion in this regard. Dr. Tschetter states in a letter that this is not a "compensatable" problem. His meaning of this phrase is unexplained. On the other hand, *Dr. James clearly indicates that [Tischler's] condition is "aggravated by work which consists of constant lifting and twisting and lifting weight up to 70 pounds."* The only other physician involved in [Tischler's] early care, Dr. Wessel, offers no opinion.

(Emphasis added.)

[¶ 29] UPS claims Tischler's subjective complaints of injury or pain are unsupported by medical evidence and are insufficient to prove she was injured. The Department was able to observe Tischler and Dr. Scherr to evaluate their credibility. The Department determined and the circuit court affirmed that the medical evidence showed a causal link between the employment and the injury. Although few doctors were asked to testify to the cause of Tischler's injuries, there was sufficient evidence in the record to support the Department's determination. Therefore, we affirm the circuit court on this issue.

[¶ 30] **2. Whether Tischler's injury while employed by the City constituted an aggravation sufficient to relieve UPS of liability.**

[¶ 31] Tischler was involved in an automobile accident while employed by the City. Although the City paid her chiropractic expenses for the next year, the Department determined that the automobile accident did not contribute independently to Tischler's permanent partial disability.

[¶ 32] In successive injury cases, the original employer/insurer remains liable if the second injury is a mere recurrence of the first. If the second injury is an aggravation that contributes independently to the final disability, the subsequent employer/insurer is liable. *Schuck*, 529 N.W.2d at 900 (citing *Day*, 490 N.W.2d at 725). Where there is a "persistence of symptoms along with no specific incident that can independently explain a second onset of symptoms, these facts present a ground for finding a recurrence." *Id.* "In order to find aggravation, it must be shown that the second episode contributed independently to the final disability." *Id.* The Department stated: "The whole of the medical testimony supports a finding that the car accident did not contribute independently to [Tischler's] final disability as it concerns her low back."

[¶ 33] Dr. Scherr testified that Tischler did not suffer an additional injury to her hip or lower back as a result of the automobile accident and wrote to Tischler's attorney, stating:

> The difficulties that [Tischler] developed with her lower back from the motor vehicle accident ... created the need for additional treatment and greater frequency of

treatment because of this complication. *However, as of this dictation, I believe that Mrs. Tischler has reached a point of pre-injury status concerning her lower back condition as it was prior to the motor vehicle accident.*

(Emphasis added.) Therefore, he concluded Tischler's need for continuing treatment was due to the injuries she received while working at UPS, not the automobile accident.

[¶ 34] Dr. Tschida, who determined Tischler's 7% disability rating, was "unable to say that the motor vehicle accident really did anything with the low back as far as increasing disability."

[¶ 35] There was no medical evidence showing the automobile accident contributed independently to Tischler's low back disability and there is substantial evidence in the record to support the Department's determination. Therefore, we affirm the circuit court on this issue.

[¶ 36] **3. Whether the denial of part of the chiropractic and medical expenses was error.**

[¶ 37] The Department adopted the findings of the Chiropractic Peer Review Committee and held certain expenses excessive. Tischler claims the Employers/Insurers did not meet their burden of proving the treatment unnecessary. *Krier v. John Morrell & Co.*, 473 N.W.2d 496, 498 (S.D.1991) (citing *Hanson v. Penrod Constr. Co.*, 425 N.W.2d 396, 399 (S.D.1988)).

[¶ 38] Tischler claims this burden was not met because the opinion of the Committee was based on its "feelings," not on a reasonable medical certainty. Dr. John S. Carr represented the Committee and testified in person before the Department. Dr. Scherr also testified in person. Therefore, we review the Department's findings to determine whether they are clearly erroneous. *Caldwell*, 489 N.W.2d at 357. Prior to the review of his treatment of Tischler, Dr. Scherr was allowed to submit documentation in support of his care. The Committee found that Dr. Scherr's records lacked objective findings to support the treatments, which treatments were excessive and promoted dependency.

[¶ 39] These findings are supported by Dr. Carr, who testified that Dr. Scherr's computer generated progress notes were "generic," lacked objective findings and made it difficult to determine the purposes of treatment.

[¶ 40] The Committee's findings for the period between August 19, 1991, and October 1992 were based on Dr. Scherr's billing records. Tischler claims the Department erred in adopting the Committee's findings because the billings indicated the dates of visits only. Dr. Carr testified that the Committee felt that, three months after the 1991 automobile accident, Dr. Scherr was not "getting the patient better and that she should be referred to somebody else, at that time, for further care." He further stated: "Dr. Scherr's documentation did not show that she was improving with his care; that care was on the same level for the next two years, and we could not see that there was therapeutic gains being made; that maybe she needed to go with some other care, and if that was combined with his care, then maybe we would see better results."

[¶ 41] As indicated, Dr. Scherr was invited to supply further records to the Committee, but did not do so. That fact and Dr. Carr's testimony support the Department's findings on this issue.

[¶ 42] Tischler also claims Dr. Carr's opinions were not based on a "reasonable medical certainty." UPS claims this standard is only required of a *claimant* attempting to establish injury. In *Krier,* we stated: "[T]he Employer has the burden to demonstrate that the treatment rendered by the treating physician was not necessary or suitable and proper." *Krier,* 473 N.W.2d at 498. *Krier* did not require that the employer establish this to a reasonable medical certainty. By the report of the Committee and related testimony, Employers met their burden that part of the treatment rendered by Dr. Scherr was not necessary or suitable and proper and the Department so found. We affirm the circuit court's order affirming the Department's decision.

[¶ 43] **4. Whether the Department abused its discretion in assigning a 7% impairment rating.**

[¶ 44] Tischler claims the 7% impairment rating was an abuse of discretion by

the Department because Dr. Scherr testified to a 10% impairment rating in 1990. The Department adopted Dr. Tschida's 7% rating, assigned in 1992, because "of the medical expertise of Dr. Tschida, as well as the more recent date of the examination[.]"

[¶ 45] Tischler claims that Dr. Scherr's rating should prevail because he had the expertise to give an impairment rating and treated Tischler more often than Dr. Tschida. UPS points out that the Committee found much of Dr. Scherr's treatment unnecessary.

[¶ 46] The trier of fact is free to accept all, part, or none of an expert's opinion. *Bonnett v. Custer Lumber Corp.*, 528 N.W.2d 393, 395 (S.D.1995) (citing *Hanson*, 425 N.W.2d at 398). Furthermore, " 'the question is not whether there is substantial evidence contrary to the agency finding, but whether there is substantial evidence to support the agency finding.' " *Id.* (citing *Kennedy v. Hubbard Milling Co.*, 465 N.W.2d 792, 794 (S.D.1991) (quoting *Lawler v. Windmill Restaurant*, 435 N.W.2d 708, 711 (S.D.1989) (Morgan, J., concurring specially))). The Department evaluated the two medical opinions. It is within the Department's discretion to disregard one expert's impairment rating and accept another. We affirm the circuit court on this issue.

[¶ 47] **5. Whether the loss of use rating of 39% was proper and, if so, whether it should be added to the 7% disability rating to form a 46% permanent partial disability.**

[¶ 48] UPS claims the Department erred in awarding loss of use of 39%, and in adding it to the 7% impairment rating to total the 46% permanent partial disability award.

[¶ 49] " 'SDCL 62–4–6 specifies the amount of compensation an employee shall receive for the loss of a part of the body or its loss of use. The clear language of this statute directs that compensation shall be paid for loss of use.' " *Caldwell*, 489 N.W.2d at 361 (quoting *Cozine v. Midwest Coast Transport, Inc.*, 454 N.W.2d 548, 551 (S.D. 1990)). The hearing examiner "must determine if, and to what extent, a claimant has suffered the loss of use of a part of the body." *Cozine*, 454 N.W.2d at 551–52. The hearing examiner must consider more than the medical impairment rating. *Welch v. Automotive Co.*, 528 N.W.2d 406, 411 (S.D. 1995). "[O]ther factors such as the testimony of vocational experts regarding loss of employability, and other testimony must be considered to determine loss of use." *Id.* (citing *Cozine*, 454 N.W.2d at 552).

[¶ 50] We have held that "a disability rating due to a 'loss of use' of a body member can . . . only be considered in the context of what effect it would have on the employee's income-earning capability[.]" *Caldwell*, 489 N.W.2d at 362. UPS claims Tischler's income-earning capabilities were not affected and points out that Tischler currently earns over ten dollars per hour, forty hours per week, while at UPS she earned ten dollars per hour, twenty hours per week. Peniston considered two factors when determining her loss of use: employability and earnings. She did not lose earnings after the injury. However, because she was restricted to sedentary work, he determined Tischler suffered a 77% loss of employability. He averaged the two numbers (giving them equal weight toward loss of use) and set 39% as her loss of use. Peniston testified his determination was based on Tischler's "worker traits," which include her "physical demand level, pre- and post-injury, her general educational development, her aptitudes, and the amount of work experience she has or the education she has."

[¶ 51] UPS claims Peniston's determination of 39% loss of use was error because Tischler's customary employment in the twenty-three years she has been in the job market had been in light to sedentary positions and therefore she had not suffered any loss of use. UPS also claims Peniston did not consider Tischler's vocational interests or wages and did not determine whether any actual openings existed for the occupations to which Tischler lost access.

[¶ 52] UPS also claims Peniston erred because he did not know the number of available openings for the jobs to which Tischler lost access. Without conceding error, Peniston admitted that he looked at accessibility, not availability. UPS insists "there is no evidence that Tischler has lost anything. To

award benefits under the guise of permanent partial disability benefits with no evidence of any actual lost employment opportunities is pure speculation."

[¶ 53] In *Hendrix v. Graham Tire Co.,* 520 N.W.2d 876 (S.D.1994), the claimant was involved in a car accident while in the course of his employment, which caused a back injury. The claimant requested permanent partial disability and presented expert testimony to show a 65% loss of employability and earning capacity. The Department awarded benefits based on a 4% disability because there was no medical impairment rating and because the claimant was able to earn comparable wages in other positions. *Hendrix,* 520 N.W.2d at 883–84. It is the responsibility of the Department to determine a claimant's loss of use. *Cozine,* 454 N.W.2d at 552. Where, as here, the claimant's loss of employability is offset by the fact that she is currently earning her pre-injury wage and is able to work even more hours than she was before the injury, it would seem more appropriate for the Department to reduce her loss of use damages as the hearing examiner did in *Hendrix.* The award of loss of use benefits should be based on a realistic loss of income-earning capability. *Caldwell,* 489 N.W.2d at 362. Awarding 39% loss of use appears high when Tischler is earning twice as much money as she was before her injury. Even the methodology appears somewhat suspect. However, the Department accepted the evaluation, the circuit court affirmed, and we are unable to say that the findings of fact are clearly erroneous based on this record.

[¶ 54] UPS urges this court to strike the Department's determination of 46% benefits because the Department merely added the 7% disability rating to the 39% loss of use rating. The circuit court stated: "While I have some reservations concerning the propriety of simply adding the two ratings together, as may have been done by the [Department], I cannot say this decision was clearly erroneous and therefore I will not reverse it."

[¶ 55] Peniston used Tischler's medical records to determine loss of use, including the fact that Dr. Tschida had assigned a 7% impairment rating. *Cozine* stated: "It is the responsibility of a hearing examiner to determine a claimant's loss of use based upon the evidence as a whole." *Cozine,* 454 N.W.2d at 552. In *Hendrix,* we noted that " '[a]lthough the medical impairment rating given by a doctor is an important factor, the extent of loss of use does not necessarily equal the extent of medical impairment.' " *Hendrix,* 520 N.W.2d at 883 (quoting *Cozine,* 454 N.W.2d at 552). The medical impairment rating may fully compensate an employee for loss of use in certain cases, while in other cases it may be necessary to determine loss of use through vocational experts. Although *Cozine* and *Caldwell* allow recovery to the full extent of loss of use, they do not authorize an employee to recover based on a medical impairment rating *plus* the employee's loss of use.

[¶ 56] In *Caldwell,* we stated a vocational expert's opinion is necessary before the Department can establish a disability rating based on loss of use "over and above a medical impairment." *Caldwell,* 489 N.W.2d at 362. In this case, Tischler's vocational expert testified to a loss of use rating of 39%. There was no expert testimony establishing a greater disability. Therefore, according to her own expert testimony which was based in part on her medical impairment rating, Tischler would have been adequately compensated for her loss of use based on Peniston's 39% rating. Neither *Cozine* nor *Caldwell* requires more. We reverse the circuit court on the second part of this issue.

[¶ 57] **6. Whether the circuit court properly remanded for determination of liability for certain medical bills.**

[¶ 58] The circuit court determined that the Department "apparently overlooked Tischler's request for the payment of certain medical bills from Drs. Berkebile, Blume, and Sabow." The circuit court remanded to determine whether one of the employers is responsible for those bills.

[¶ 59] UPS claims the remand was error because the outstanding bills were from doctors referred by Dr. Scherr. UPS claims only a portion of Dr. Scherr's treatments for

this period were reasonable and necessary, and therefore the referrals were not reasonable and necessary.

[¶ 60] The circuit court stated: "[The Department's] memorandum decision in its ultimate findings are silent as to compensation for services provided by Dr. Berkebile, Dr. Blume, and Dr. Sabow. It appears to this court that there is a basis for consideration of some of these expenditures. It also appears to this court that they were overlooked by oversight and I will remand this aspect of the decision for review[.]" Tischler claims and UPS does not dispute that the bills from these doctors were presented to the Department. Therefore, we affirm the circuit court's remand on the issue of these medical bills.

[¶ 61] Tischler counters that the Department should also be required to rule on a hydrotherapy unit. The hydrotherapy unit was not discussed in the Department's decision or its findings of fact and conclusions of law. It was not addressed in Tischler's proposed findings of facts and conclusions of law. The circuit court stated, "it is my opinion that this was not overlooked but rather was not significantly raised and there is no support for a finding that the hydrotherapy is [a] compensable therapy." We affirm the circuit court.

### [¶ 62] 7. Whether Tischler is entitled to prejudgment interest and costs.

[¶ 63] The Department awarded prejudgment interest on the permanent partial disability rating starting April 4, 1992, the date Dr. Tschida assigned the 7% permanent partial disability rating adopted by the Department. The Department awarded prejudgment interest on the 39% loss of use rating of March 3, 1993, the date Peniston assigned it. The Department awarded prejudgment interest under SDCL 21–1–11,[2] which provides:

Every person who is entitled to recover damages certain, or capable of being made certain by calculation, and the right to recover which is vested in him upon a particular day, is entitled also to recover interest thereon from that day, except during such time as the debtor is prevented by law, or by the act of the creditor, from paying the debt.

[¶ 64] UPS claims Tischler's damages were not ascertainable. Alternatively, UPS claims prejudgment interest should not accrue until the date the Department determined the employer must pay benefits.

[¶ 65] This court addressed the application of SDCL 21–1–11 in worker's compensation cases in *Johnson v. Skelly Oil Company*, 359 N.W.2d 130 (S.D.1984). There, we held "prejudgment interest may be allowed if (1) the damages are certain or capable of being made certain by calculation; and (2) the right to recover vested on a particular day." *Skelly*, 359 N.W.2d at 133. *Skelly* held the employee was entitled to prejudgment interest because the employer never questioned the reasonableness of unpaid medical bills and expenses but merely claimed it was not liable. Similarly, here, the employer did not provide the Department with its own loss of use rating so the Department could calculate only from Peniston's determination. UPS knew that impairment ratings of 7% or 10% were available in the event Tischler was awarded permanent partial benefits. The amount of Tischler's claim could be calculated with these ratings. These ratings provide a "market price or value" for Tischler's claims. While they are not set dollar amounts, like medical bills, they enable ascertainment under SDCL 21–1–11 and 62–4–6. Therefore, it was not error for the Department to award prejudgment interest from the dates of the impairment ratings even though UPS disputed liability.[3] However, in view of our partial reversal of permanent partial disability benefits under issue 5, we remand for recalculation.

---

2. UPS points out that Tischler requested prejudgment interest under SDCL 21–1–13.1, to accrue from August 1990. However, the Department awarded prejudgment interest under SDCL 21–1–11, accruing from the dates the doctors determined impairment and loss of use ratings.

3. Tischler claims prejudgment interest should accrue in August 1990, when Dr. Scherr assigned his disability rating but we disagree because the Department did not use Dr. Scherr's disability rating.

[¶ 66] The Department denied costs to Tischler. The circuit court affirmed. SDCL 62–7–15 provides in part:

All costs incurred in the hearing before the department may be taxed against the losing party or an equitable apportionment made thereof by the department according to the facts.

In construing this statute to affirm denial of costs, this court has stated: "By the use of the term 'may be taxed' in this section, the legislature indicated an intention to put costs of the administrative proceeding within the discretion of Department. This language is clearly permissive rather than mandatory. Absent an abuse of discretion, Department's decision on this issue must stand." *Wilcox v. City of Winner,* 446 N.W.2d 772, 775 (S.D. 1989).

[¶ 67] In this case, the Department denied costs because all parties disputed issues. Tischler was attempting to gain benefits and UPS and the City were attempting to avoid paying chiropractic expenses which the Department ultimately held unnecessary. We see no abuse of discretion in this ruling and we affirm the circuit court on costs.

[¶ 68] **8. Whether SDCL 62–4–10.1 is retroactive and whether Tischler is entitled to an automatic penalty.**

[¶ 69] In 1991, the South Dakota Legislature enacted SDCL 62–4–10.1, which provides in part:

Failure to make any payment of workers' compensation benefits pursuant to § 62–4–10 within ten days of the date on which the payment is due shall result in an automatic penalty equal to ten percent of the unpaid amount[.]

[¶ 70] The Department did not award a penalty because "each party had a legitimate dispute in this case." The circuit court reversed. UPS appeals, claiming Tischler was injured in 1988, filed her claim in 1989, and SDCL 62–4–10.1 was not enacted until 1991. Tischler argues that benefits become "due" within the meaning of the statute after the 1991 effective date because the 1992 impairment rating was adopted by the Department and Peniston's report was prepared in 1993.

Therefore, she claims the penalty is available. The circuit court stated:

The penalty provided under SDCL 62–4–10.1 became law on July 1, 1991. While the injury herein was sustained prior to that time and although the petition was filed in this matter in 1989, it does not seem unreasonable to deem that the penalty would become active and applicable to this case on July 1, 1991. I would find that as a matter of law the denial of penalty would be inappropriate and would so reverse that portion of the decision.

[¶ 71] Employer points out that " '[t]he general rule is that newly enacted statutes will not be given a retroactive effect unless such an intention is plainly expressed by the legislature.' " *Schultz v. Jibben,* 513 N.W.2d 923, 925 (S.D.1994) (quoting *Dahl v. Sittner,* 474 N.W.2d 897, 901 (S.D.1991)). However, "[s]tatutes affecting remedy or procedure are to be given retroactive effect." *Koenig v. Lambert,* 527 N.W.2d 903, 907 (S.D.1995) (Sabers, J., concurring in part and dissenting in part) (citing *Lyons v. Lederle Laboratories,* 440 N.W.2d 769, 770 (S.D. 1989); 2 Sutherland, Statutes and Statutory Construction, § 41.09 (5th Ed.1992); *State v. Kelley,* 588 So.2d 595, 597 (Fla.Dist.Ct.App. 1991)).

[¶ 72] Statutes which fall into the category of "statutes affecting remedies" are "ones that describe methods for enforcing, processing, administering, or determining rights, liabilities or status." 2 Sutherland, *supra,* § 41.09 at 399. One can argue that SDCL 62–4–10.1 is an attempt by the legislature to provide claimants with a means to enforce their rights. However, as in *West v. John Morrell & Co.,* 460 N.W.2d 745 (S.D. 1990), this statute created a new right for the employee to collect the automatic penalty and a new duty on the employer and insurer to pay. "Statutes affecting substantive rights ... are not to be given retroactive effect." *West,* 460 N.W.2d at 747. "The test is whether the change in the statute constitutes a change in substantive law (as opposed to procedural law) and not whether a change in the statute affects the substantive rights of the parties." *Schultz,* 513 N.W.2d at 925 n. 3. SDCL 62–4–10.1 created a penalty. Be-

cause the statute *"created the obligation in the first place, where there had been none before,"* it is substantive and not entitled to retroactive effect. *West,* 460 N.W.2d at 748 (Sabers, J., concurring) (emphasis added).

[¶ 73] The result of this case would not change even if the statute were applied retroactively. Tischler would not be entitled to the penalty under these facts. The Department did not award the penalty because a legitimate dispute existed between the parties and we agree.

[¶ 74] SDCL 62–4–10.1 does not condition the penalty on the presence or absence of a good-faith dispute nor does it provide guidance as to when payment is due. Other courts recognize that no penalty is allowed when there is a good-faith belief that payment is not due.[4] *See* 3 Larson, The Law of Workmen's Compensation, § 83.41(b)(2) at 15–1410 (1995).

[¶ 75] For example, Nebraska workers' compensation law provides a penalty for delinquent payments after notice.[5] Though the statute did not provide an exception for disputes between the parties, the Nebraska Supreme Court did not impose a penalty where a reasonable controversy existed. *Mendoza v. Omaha Meat Processors,* 225 Neb. 771, 408 N.W.2d 280, 288–89 (1987).

[¶ 76] In this case, there was no award from the Department until the hearing. Where there is a good-faith dispute between the parties, we see no reason to penalize the employer and insurer for refusing to pay benefits to a claimant prior to an order from the Department. If there has been no wrongdoing or unreasonable delay by the employer or insurer, prejudgment interest should adequately compensate a claimant for the loss of use of money.

[¶ 77] We believe the penalty is appropriate only in the absence of a good-faith dispute. Here, liability depended in part on the credibility of Tischler and Dr. Scherr, both of whom testified at the hearing. Because a good-faith dispute existed, the payment was not "due" within the meaning of the statute and the penalty was not appropriate.

[¶ 78] MILLER, C.J., and AMUNDSON, KONENKAMP and GILBERTSON, JJ., concur.

---

4. Other courts have discussed whether a penalty is appropriate under their statutes. The provisions of federal law under the Longshoremen's and Harbor Worker's Compensation Act, 33 USC § 941(e) require the employer to either compensate the claimant or file a notice disputing the right to compensation within fourteen days after the injury is reported. If the employer does not, a penalty is mandatory unless nonpayment is due to conditions beyond the employer's control. *White v. Newport News Shipbuilding & Dry Dock Co.,* 633 F.2d 1070, 1075 (4th Cir.1980). Where an insurer waited to deny the claim until one hundred fifteen days after the notice of an injury, it was assessed a 20 percent penalty on payments due from the date of notice to the date of denial. *Kosanke v. State Accident Ins. Fund,* 41 Or.App. 17, 596 P.2d 1013, 1014–15 (1979). A penalty may be assessed for "arbitrary refusal to pay benefits without probable cause," when a doctor diagnosed the injury as work-related. *Allums v. Dixie Metals Co.,* 369 So.2d 1204, 1208 (La.Ct. App.1979). Montana statutes provide a penalty when " 'payment of compensation has been unreasonably delayed or refused by the insurer, either prior or subsequent to the issuance of an order by the workers' compensation judge' " granting benefits. *Carlson v. Cain,* 216 Mont. 129, 700 P.2d 607, 612 (1985). Florida statutes provide for a penalty if compensation, "payable under the terms of an award, is not paid within 7 days after it becomes due[.]" FlaStatAnn § 440.20(7) (West 1991 & Supp 1996).

5. Nebraska Revised Statutes § 48–125 currently provides in part:

> Except as hereinafter provided, all amounts of compensation payable under the Nebraska Workers' Compensation Act shall be payable periodically in accordance with the methods of payment of wages of the employee at the time of the injury at death; *Provided, fifty percent shall be added for waiting time for all delinquent payments after thirty days' notice has been given of disability.* ...

NebRevStat § 48–125 (1992).