2000 SD 82

**Mohammed BELHASSEN, Claimant and Appellant,**

v.

**JOHN MORRELL & COMPANY, Employer, Self–Insurer and Appellee.**

**Nos. 21253, 21258.**

Supreme Court of South Dakota.

Considered on Briefs April 24, 2000.

Decided June 21, 2000.

Scott G. Hoy of Scott G. Hoy Law Office, Sioux Falls, for claimant and appellant.

Michael S. McKnight, Lisa Hansen Marso of Boyce, Murphy, McDowell & Greenfield, Sioux Falls, for employer, self insurer and appellee.

AMUNDSON, Justice.

[¶ 1.] Mohammed Belhassen (Belhassen) appeals the Department of Labor's (Department) denial of odd-lot benefits and *Cozine* benefits. We affirm.

## FACTS

[¶ 2.] Belhassen began working for John Morrell & Company of Sioux Falls, South Dakota in April 1992.[1] In October 1993, Belhassen suffered a work-related injury to his back in the course of his employment with John Morrell. As a result of this injury, Belhassen was ordered off work from October 7, 1993 to March 6, 1995.[2] On May 26, 1994, Dr. Asfora performed arthroscopic surgery on Belhassen's back.[3] Despite the surgery, Belhassen continued to have problems with his back and was referred to Dr. Charles Burton.

[¶ 3.] Dr. Burton, a neurosurgeon and Senior Medical Director for the Institute of Low Back and Neck Care in Minneapolis, Minnesota, examined Belhassen on October 5, 1994. Burton diagnosed Belhassen with a two-level degenerative disease and recommended further surgery on L3–4 Level of Belhassen's back.

[¶ 4.] On December 7, 1994, John Morrell sent Belhassen to Dr. David Hoversten for an Independent Medical Evaluation. Hoversten found that Belhassen was uncooperative during the examination and was exaggerating his pain symptoms. Hoversten concluded that Belhassen was "a poor candidate for surgery and that it would be 'likely to result in several further surgeries with a total disability after he had been operated on enough times.'" John Morrell then sent Belhassen to Dr. Frederick Entwistle on May 25, 1995. Entwistle recommended Belhassen undergo additional surgery, but referred Belhassen to Dr. Joseph Cass for a second opinion. On June 26, 1995, Dr. Cass examined Belhassen and recommended additional surgery was necessary. Belhassen underwent the surgery on July 15, 1995.

[¶ 5.] Belhassen was released by Dr. Cass to return to work on October 23, 1995, with instructions that Belhassen work only four hours a day and perform only light duty. Within a month, Belhassen was reporting the same symptoms in his back that he had complained of prior to the July surgery. At a follow-up appointment with Dr. Cass, Cass was unable to determine the source of Belhassen's symptoms, but released him back to work with the same light duty work restrictions.

[¶ 6.] On March 27, 1996, after further concerns had been raised about Belhassen's ability to perform his assigned work, Dr. Cass ordered a functional capacity assessment and re-examined Belhassen to

---

1. At the time of this action, Belhassen was fifty-one years old. He was born in Libya where he was educated only up to the fifth grade. Belhassen does not read, write or speak English. Further, while in Libya, Belhassen was in the Libyan army for seventeen years where he was a driver of Toyota minivans and an infantryman. Belhassen arrived in the United States in 1991 and began working for John Morrell shortly thereafter.

2. Belhassen was paid temporary total disability benefits during his time off work at John Morrell. Belhassen also received a ten percent impairment rating of the whole person and was paid benefits based upon this rating.

3. In November 1993 Belhassen was diagnosed with a bulging disk with possible herniation. Belhassen underwent an arthroscopic microdiskectomy at the L3–4 level of his spine in an attempt to correct the injury.

formulate an impairment rating. Dr. Cass concluded that Belhassen had a ten percent impairment of the whole person under the AMA Guide to Impairment (Fourth Edition). Dr. Hoversten performed two examinations and found that under the AMA Guide (Fourth Edition) Belhassen had a fifteen percent impairment of the whole person, but under the AMA Guide (Third Edition) Belhassen had a ten percent impairment of the whole person.

[¶ 7.] On June 7, 1996, John Morrell sent Dr. Cass a letter asking him to review a videotape depicting the retrim blade meat job and determine whether it would be appropriate for Belhassen. Registered nurse Linda Pudenz reviewed the videotape and subsequently spoke with Dr. Cass about her observations. Dr. Cass ultimately approved the retrim blade meat job for Belhassen, based upon Pudenz's observations, but provided that weight restrictions be maintained and Belhassen be allowed to sit or stand at his convenience.

[¶ 8.] While Belhassen had initially been released back to work and required to work only four hours per day, after a brief period, Belhassen ultimately was allowed to return to work full-time, but would alternate between two job functions on an hourly basis: standing and trimming meat for one hour and sitting and assembling boxes for another hour. On August 1, 1996, Belhassen was informed that he would be expected to work the retrim blade meat position for an entire eight-hour shift and not just every other hour. Belhassen claims that he attempted to explain to his supervisor that an eight-hour shift on the retrim blade position would violate his medical restrictions from Dr. Cass.[4] Belhassen, therefore, refused to perform the eight-hour shift. After subsequent meetings between Belhassen, Belhassen's union representative, an interpreter, two of Belhassen's supervisors and John Morrell's personnel director, Belhassen still refused to perform the job and he was discharged for refusing the assignment.

[¶ 9.] After his termination, Belhassen attempted to find work by registering with Job Service. Belhassen filled out one application with Carlisle Plastics, but was not hired. Further, Belhassen never contacted or was contacted by Job Service regarding any potential job openings. Belhassen did not apply for any other jobs.

[¶ 10.] Belhassen brought a workers' compensation action before Department to determine whether he was entitled to "odd lot benefits" and "*Cozine* benefits." On December 16, 1998, the Administrative Law Judge (ALJ) for the Department rejected Belhassen's expert, Rick Ostrander's opinion and denied Belhassen's request for odd lot and *Cozine* benefits. Belhassen appealed the decision to the circuit court which affirmed the denial of benefits to Belhassen. Belhassen subsequently filed a Motion for Reconsideration and a Motion for Order Allowing for Additional Evidence, but the motions were both denied. Belhassen appeals, raising the following issues:

1. Whether Belhassen is entitled to odd-lot benefits.

2. Whether Belhassen is entitled to *Cozine* benefits.

John Morrell filed a Notice of Review, raising the following issues:

3. Whether *Cozine* benefits should be denied due to Belhassen's failure to look for work.

4. Whether *Cozine* benefits should be denied due to Belhassen's ability to return to his usual and customary line of employment.

---

4. While not an issue in this case, it is quite concerning as to how Belhassen was able to explain to his supervisor that his move to an entire eight-hour shift on the re-trim position would violate his medical restrictions. This concern is based upon Belhassen's continual assertions that he cannot read, speak or understand English. However, Belhassen apparently has a good understanding of medical restrictions phrased by his doctor in the English language.

## STANDARD OF REVIEW

[¶ 11.] Our standard of review in workers' compensation cases is well settled. We have often stated that " '[u]nder SDCL 1–26–37, when the issue is a question of fact, then the clearly erroneous standard is applied to the agency's findings; however, when the issue is a question of law, the actions of the agency are fully reviewable.' " *Brady Mem'l Home v. Hantke,* 1999 SD 77, ¶ 8, 597 N.W.2d 677, 679–80 (quoting *Wagaman v. Sioux Falls Constr.,* 1998 SD 27, ¶ 12, 576 N.W.2d 237, 240 (citing *Loewen v. Hyman Freightways, Inc.,* 1997 SD 2, ¶ 6, 557 N.W.2d 764, 766 (citations omitted))). Under our review, "we are required to give 'great weight to the findings and inferences made by Department on factual questions.' " *Id.* (quoting *Wagaman,* 1998 SD 27, ¶ 12, 576 N.W.2d at 240 (citing *Sopko v. C & R Transfer Co., Inc.,* 1998 SD 8, ¶ 6, 575 N.W.2d 225, 228 (citations omitted))). Further, " '[i]f after careful review of the entire record we are definitely and firmly convinced a mistake has been committed, only then will we reverse.' " *Id.* (quoting *Sopko,* 1998 SD 8, ¶ 6, 575 N.W.2d at 228 (citations omitted)).

## DECISION.

[¶ 12.] **1. Whether Belhassen is entitled to odd-lot benefits.**

[¶ 13.] We have often stated that the determination of whether a claimant is entitled to permanent total disability benefits, otherwise known as odd-lot disability benefits, is determined as follows:

[A] person is totally disabled if his physical condition, in combination with his age, training, and experience, and the type of work available in his community, causes him to be unable to secure anything more than sporadic employment resulting in insubstantial income.

Under this doctrine, an employee first bears the burden to show total disability. If it is "obvious" an employee falls within the "odd-lot" category, the employer must then prove positions in the community are available for persons with the employee's limitations. A claimant may show "obvious unemployability" by: (1) showing that his physical condition, coupled with his education, training and age make it obvious that he is in the odd-lot total disability category, or (2) persuading the trier of fact that he is in fact in the kind of continuous, severe and debilitating pain which he claims. Inversely, if the employee is not obviously unemployable, the burden remains with the employee to demonstrate the unavailability of suitable employment, after reasonable albeit unsuccessful, efforts to find work.

*Kurtz v. SCI,* 1998 SD 37, ¶ 14, 576 N.W.2d 878, 883–84 (quoting *Zoss v. United Bldg. Ctrs., Inc.,* 1997 SD 93, ¶ 16, 566 N.W.2d 840, 845 (citations & internal quotations omitted)). To establish his entitlement to odd-lot benefits, Belhassen must either show that he is "obviously unemployable" or show that suitable employment is unavailable based upon Belhassen's reasonable, yet unsuccessful, efforts to find work. *See Petersen v. Hinky Dinky,* 515 N.W.2d 226 (S.D.1994). We will discuss each separately.

### Obvious Unemployability

[¶ 14.] We have previously held,

[a] claimant can establish obvious unemployability by showing either that his physical condition along with his education and training make it obvious that he is in the odd-lot total disability category, or by convincing the trier of fact that he suffers the kind of continuous, severe, and debilitating pain which he claims.

*Wagaman,* 1998 SD 27, ¶ 22, 576 N.W.2d at 242. The ALJ found that "[t]he evidence presented at the hearing [did] not establish that Belhassen is obviously unemployable." The ALJ noted that Ostrander, who stated that Belhassen was obviously unemployable, "was not aware of Belhassen's history as a truck driver and

did not consider the employment possibilities occasioned by that experience." The ALJ further held that because Belhassen was "able to perform full-time work with John Morrell," that was proof that he was not "obviously unemployable." Finally, ALJ noted,

> [w]hile I believe Belhassen's general assertion of pain, I do not believe all of his reporting of pain is accurate. I make this assessment based on the medical records and my own observations of [Belhassen] during the hearing. Simply put, I do not believe Belhassen's assertion that he is in such severe and debilitating pain that he is permanently, totally disabled. His ability to perform the boxing and blade retrim work at John Morrell belies any claim of such debilitating pain.

[¶ 15.] Belhassen contends that he is "obviously unemployable" for the following reasons: (1) he cannot read, write, speak or understand English; (2) he has a light duty work restriction with limited twisting and bending; (3) Belhassen's treating physician testified that Belhassen needs the option of sitting or standing when needed; (4) Belhassen has a standing limitation of thirty minutes and a sitting limitation of sixty minutes; (5) Belhassen's prior work experience consists of office cleaner and a van driver, both of which Belhassen argues are not transferable skills; and (6) Belhassen has only a fifth grade education. Belhassen also argues that his vocational expert's Ostrander's testimony supports his argument that he is obviously unemployable. Ostrander had stated in his testimony,

> I think it is an obvious situation. I don't think there is anything that can reasonably be done to help him be employable. That is, I don't think there is any type of rehabilitation that will succeed. What we have is a 51–year old man who does not speak English, who is poorly educated even in his native third world country and has no English skills.

[¶ 16.] John Morrell argues that Belhassen was not "obviously unemployable" because there was no reason Belhassen could not work or look for work. In support of this argument, John Morrell emphasizes that Dr. Cass and Dr. Hoversten both had approved the retrim blade meat job at John Morrell for Belhassen. In addition, Dr. Cass testified that there was no medical reason that Belhassen could not be working or looking for work. Finally, John Morrell contends that the Department was correct in rejecting Ostrander's expert opinions because he was not aware of the significant facts. Ostrander, who had evaluated Belhassen's work skills and employability, noted in his report that Belhassen's only prior work experience in Libya was as an office cleaner. Ostrander had testified that he had no knowledge that Belhassen was in the military or that he had driven a van in the Libyan army.

[¶ 17.] It is our well-settled rule that " '[d]ue regard shall be given to the opportunity of the agency to judge the credibility of the witness.' " *Kurtz*, 1998 SD 37, ¶ 12, 576 N.W.2d at 883 (quoting *Bonnett v. Custer Lumber Corp.*, 528 N.W.2d 393, 396 (S.D.1995) (citation omitted)). We have often stated that "[t]he value of the opinion of an expert witness is no better than the facts upon which it is based. . . . The credibility of witnesses and the evidentiary value of their testimony falls solely within the province of the [fact finder]." *Bridge v. Karl's, Inc.*, 538 N.W.2d 521, 525 (S.D.1995). " 'The trier of fact is free to accept all of, part of, or none of, an expert's opinion.' " *Kester v. Colonial Manor of Custer*, 1997 SD 127, ¶ 24, 571 N.W.2d 376, 380 (quoting *Hanson v. Penrod Constr. Co.*, 425 N.W.2d 396, 398 (S.D.1988) (citations omitted)). Further, Department " 'is not required to accept the testimony of the claimant and is free to choose between conflicting testimony.' " *Wagaman*, 1998 SD 27, ¶ 29, 576 N.W.2d at 242–43 (quoting *Petersen*, 515 N.W.2d at 235 (citation & internal quotation omitted)).

[¶ 18.] In the present case, the ALJ had the opportunity to hear the testimony from Ostrander and Belhassen and concluded that their testimony was not credible. After reviewing the record and the ALJ's decision, we find no mistake in the ALJ's decision. Belhassen continually emphasized his lack of education and inability to communicate in the English language as support for his "obvious unemployability." The trier of fact did not accept claimant's and expert's testimony as credible, as is within its discretion. Belhassen has failed to convince this Court that a mistake was made.

### Inability to Locate Employment

[¶ 19.] Belhassen's alternative argument for recovery is that he has been unable to locate employment and should be entitled to recover odd-lot benefits. Department rejected Belhassen's argument and concluded that Belhassen had "not established unavailability of suitable employment by showing that he has made 'reasonable efforts' to find work." Department noted that Belhassen completed and submitted an application to Carlisle Plastics, but "[t]here is no evidence that Carlisle Plastics requested any further information or testing from Belhassen." Further, Department noted that there was "no evidence in the record that Belhassen applied for any other employment."

[¶ 20.] A review of the record supports the ALJ's conclusion that Belhassen's efforts to find suitable employment were not "reasonable." We have previously stated that a claimant must make "reasonable" efforts. *See Wagaman,* 1998 SD 27, ¶ 35, 576 N.W.2d at 243. Despite his initial registration with Job Service, no evidence exists that Belhassen made any further contacts with Job Service or applied for any other employment. Further, the evidence shows that after six months with Job Service, Belhassen was placed on the inactive status. Belhassen failed to make any further efforts to find employment during this time whether it was through Job Service or by his own efforts. It is clear that Belhassen's efforts were far from "reasonable." Based upon our review of the record, Belhassen has failed to show that the ALJ erred in not awarding him permanent total disability benefits.

### [¶ 21.] 2. Whether Belhassen is entitled to *Cozine* benefits.

[¶ 22.] "*Cozine* benefits are those which are paid to a claimant for the loss of a part of the body or its loss of use." *Kurtenbach v. Frito–Lay,* 1997 SD 66, ¶ 29, 563 N.W.2d 869, 876 (citing *Cozine v. Midwest Coast Transp., Inc.,* 454 N.W.2d 548, 551–52 (S.D.1990); SDCL 62–4–6). In *Cozine,* we held that a medical impairment rating will not always measure loss of use and "[a]lthough the medical impairment rating given by a doctor is an important factor, the extent of loss of use does not necessarily equal the extent of medical impairment." 454 N.W.2d at 552. The South Dakota Legislature thereafter enacted SDCL 62–1–1(8), which provided at the time of Belhassen's injury:

"Permanent partial disability," a loss of use of the body or member of the body which is partial and permanent and shall be determined by a medical impairment rating, expressed as a percentage to the affected body part, using the guide to evaluation of permanent impairment established by the American medical association, third edition, November 1988. In addition to the medical impairment rating as set forth above, the employee is entitled to receive up to an additional fifty percent of the affected body part if the medical impairment rating given does not adequately reflect his loss of use as measured by the ability of the employee to perform work in the open labor market and to earn comparable wages taking into consideration the employee's education, training, experience and capacity for rehabilitation. There is a presumption that the employee has no loss of use beyond the medical impairment rating if the employee is able to

return to his usual and customary line of employment[.]

SDCL 62–1–1(8) (1993).[5] In determining whether Belhassen is entitled to *Cozine* benefits, "[i]t is for Department to determine 'if, and to what extent, a claimant has suffered the loss of use of a part of the body.' [citation omitted]. Factors such as a medical impairment rating, testimony of vocational experts, and other testimony *must be considered* to determine loss of use." *Wagaman,* 1998 SD 27, ¶ 41, 576 N.W.2d at 244 (citing *Tischler v. UPS,* 1996 SD 98, ¶ 49, 552 N.W.2d 597, 605) (emphasis added).

[¶ 23.] In the present case, Belhassen presented expert testimony only from Ostrander. The ALJ heard Ostrander's testimony and found it lacked credibility because it "was based on erroneous information regarding Belhassen's prior work history." The ALJ concluded,

[a]s a matter of simple logic it seems that Belhassen has suffered a loss beyond his impairment rating. For example, a person who suffers from the same physical limitations as Belhassen, but has basic English skills, would be more employable than Belhassen. Recognizing the existence of a loss beyond the impairment rating is not enough. A specific percentage of loss must be determined. Making such a determination requires a valid and reliable expert assessment. After carefully considering all the evidence, I must reject Mr. Ostrander's opinion. I cannot accept his casual, almost flippant, disregard of [Belhassen's] 17 years of experience as a driver in Libya. After acknowledging that he did not know for certain what employment Belhassen had held in Libya, Ostrander opined that Belhassen had

no transferable skills when he came to the United States. I cannot accept that opinion, based as it is on the admitted lack of information regarding [Belhassen's] employment history in Libya. The oft-quoted maxim that an expert's opinion is entitled to no more weight than the facts upon which it is based is certainly well applied to this situation.

Finally, the ALJ opined that Belhassen failed to meet his burden of proof in establishing any loss of use beyond his impairment rating.

[¶ 24.] John Morrell argues that it was not clearly erroneous for ALJ to reject Ostrander's expert testimony. In support of its argument, John Morrell cites *Loewen v. Hyman Freightways, Inc.,* 1997 SD 2, 557 N.W.2d 764. Belhassen once again argues that Department's decision to reject Ostrander's opinion was clearly erroneous. Belhassen contends that it is "common sense" that "the ability to drive in Libya does not transfer to the ability to drive for employment in the local job market." Belhassen also argues that based on his inability to read, speak or understand English, combined with his other physical and education limitations, would make obtaining a commercial driver's license difficult. Finally, Belhassen claims that "[s]eventeen years of experience at the low end of the semi-skilled job range does not miraculously transform that semi-skilled job into a transferable job skill."

[¶ 25.] In *Loewen,* we noted:

[T]he Department is in the best position to assess the credibility of the witness and the weight to be accorded their testimony, and we give due regard to its opportunity to observe the witnesses and the evidence first hand. [*Petersen,* 515 N.W.2d at 235]; *Wendel v. Domestic*

---

5. The above mentioned SDCL 62–1–1(8) was substantially amended in 1994. The commission note to the current SDCL 62–1–1 notes that since the contents of the 62–1–1(8) were also adopted under 62–1–1.2, "the Legislative intent was to repeal subdivision (8) of this section because it would have been redundant." Under SDCL 62–1–1.2, which was also adopted in 1994, "impairment shall be determined by a medical impairment rating, expressed as a percentage to the affected body part, using the Guides to the Evaluation of Permanent Impairment established by the American Medical Association, fourth edition, June 1993."

*Seed & Supply*, 446 N.W.2d 265, 271 (S.D.1989). We will not substitute our judgment for the agency's on an issue of credibility unless we are "left with a definite and firm conviction that a mistake has been made." *Lien v. Miracle Span Corp.*, 456 N.W.2d 563, 565 (S.D. 1990).

1997 SD 2, ¶ 11, 557 N.W.2d at 767. Ostrander admitted that he did not know if or how long Belhassen was a driver in the Libyan military or how long he had done cleaning work in Libya. It was within the ALJ's discretion to assess the credibility of Ostrander and determine whether to accept it. The ALJ did not accept it because it was "entitled to no more weight than the facts upon which it is based." Belhassen had no credible expert testimony to support his claims; therefore, ALJ did not believe that Belhassen's claims entitled him to *Cozine* benefits. Reviewing the record, we cannot say that a mistake was made by the ALJ.

[¶ 26.] Based upon our disposition of the first two issues, we need not discuss John Morrell's issues.

[¶ 27.] We affirm.

[¶ 28.] MILLER, Chief Justice, and KONENKAMP and GILBERTSON, Justices, concur.

[¶ 29.] SABERS, Justice, dissents.

SABERS, Justice (dissenting).

[¶ 30.] The majority opinion affirms the denial of permanent total disability and *Cozine* benefits. I respectfully disagree and would reverse because Belhassen established a prima facie case of permanent total disability. Therefore, this case should be remanded to determine whether Morrell met its burden of showing that suitable employment is available within Sioux Falls that will accommodate all of Belhassen's limitations. Accordingly, the issue of whether Belhassen is entitled to *Cozine* benefits does not need to be reached.

[¶ 31.] **Belhassen has satisfied his burden of proof that he is obviously unemployable.**

[¶ 32.] A claimant is entitled to permanent total disability if:

'[A] person is totally disabled if his physical condition, in combination with his age, training, and experience, and the type of work available in his community, causes him to be unable to secure anything more than sporadic employment resulting in insubstantial income.' The burden is on claimants to make a prima facie showing that their physical impairment, age, mental capacity, training, and education place them in the odd-lot category.

*Wagaman v. Sioux Falls Constr.*, 1998 SD 27, ¶ 21, 576 N.W.2d 237, 241 (quoting *Shepherd v. Moorman Mfg.*, 467 N.W.2d 916, 918 (S.D.1991)) (other citations omitted). In establishing "obvious unemployability," Belhassen can show either:

(1) that his physical condition along with his education and training make it obvious that he is in the odd-lot total disability category, *or*

(2) that he suffers the kind of continuous, severe, and debilitating pain....

*Id.* ¶ 22 (citations omitted) (emphasis added). Once Belhassen proves that he is "obviously unemployable," the burden shifts to the employer to show that suitable employment is available within the community that will accommodate the claimant's limitations. *Id.*

[¶ 33.] Belhassen is 53–years–old. He injured his back in October of 1993 while lifting a box at work. The diagnosis was a bulging disc with possible herniation. After two surgeries, he was gradually restricted to "light duty" work, with instructions to limit his twisting activity and alternate various light duty jobs. Morrell initially complied with these medical restrictions and Belhassen stood for one-hour re-trimming meat and sat the next hour assembling boxes. On March 27,

1996, Dr. Cass reported that Belhassen should continue "light duty" and avoid excessive bending and twisting.

[¶ 34.] On June 5, 1996, Belhassen was disqualified from working the re-trim position, which is internally referred to as a "Grade 4" job because it is a very strenuous position. However, on July 7, 1996, Dr. Cass' nurse reviewed a videotape of the re-trim position, and, based on her account of the job, Dr. Cass conditionally approved the position for Belhassen. The condition was that he be *allowed to sit or stand at his convenience*. Besides the *conditional* approval, it is important to note that the videotape did not show the specific job within the re-trim department that Belhassen was asked to perform. Nor did the videotape reflect that "butt boards" would be used to accommodate Belhassen, which was contrary to Dr. Cass' conditional approval. Furthermore, the speed of this line was not accurately portrayed in the videotape nor the job specifications; i.e. the specific percentages of fat that had to be trimmed from the meat at the speed of the line.

[¶ 35.] On August 1, 1996, Morrell required Belhassen to work the re-trim position for eight continuous hours instead of his approved restriction of alternating jobs every hour. Coincidentally, this was the *same* position that Morrell *disqualified* Belhassen from just two months before. In a feeble attempt to comply with his medical restrictions, Morrell provided Belhassen with a butt board, which he could lean back against to relieve the pressure from his feet. At best, the butt board allowed him to *partially* sit while continuing to work. Yet, Morrell's butt board did not comply with Dr. Cass' work restrictions or his conditional approval of the position. Dr. Cass did not condition his approval of the re-trim job on Belhassen being allowed to *partially* sit.

[¶ 36.] As stated, Morrell was required to provide Belhassen with alternating positions of *completely* sitting down in a chair or standing. Additionally, a functional ca-

pacity assessment was issued in February of 1998 and it verifies that Belhassen was restricted to light duty and must vary sitting, standing and walking with limited bending and stooping. Even Morrell's expert witness, Mary Ann Schuerman, who conducted an onsite job analysis, testified that the re-trim job required an employee to stand at least eighty percent of the shift, less if a butt board was utilized. This means that Belhassen could be required to stand on his feet for nearly six and one-half hours during an eight-hour shift. The fact that Belhassen refused to work an eight-hour shift on a fast, strenuous line with only a butt board available was justified as Morrell violated Belhassen's work restrictions.

[¶ 37.] In summary, it is obvious that Belhassen is physically disabled and is unable to perform an eight-hour shift on his feet, even with the purported "accommodation" of a butt board. Morrell apparently agreed as evidenced by its compliance with his work restrictions for over three years and by its *disqualification* of Belhassen from the re-trim job in June of 1996. However, without explanation, Morrell suddenly required him to work an eight-hour shift on the "strenuous" line of re-trim, a position he was *disqualified* from two months earlier. It is clear that Morrell knew that Belhassen could not perform this job and the accommodation of a butt board was wholly inadequate.

[¶ 38.] A very significant factor in the decisions of the DOL and the majority opinion is that Belhassen was "a truck driver and infantryman in the Libyan Army for approximately seventeen years." Belhassen's vocational expert, Rick Ostrander, was not aware of this experience at the time he conducted his evaluation and did not consider the employment possibilities occasioned by that experience at that time. However, during the hearing, he testified that given Belhassen's limitations, the skills acquired in Libya are not transferable to the available labor market in Sioux Falls, South Dakota.

[¶ 39.] Belhassen does not read, write or speak English. The majority opinion repeatedly attempts to shade his credibility by implying that Belhassen is somewhat capable of communicating in English. For example, the majority opinion notes:

it is quite concerning as to how Belhassen was able to explain to his supervisor that his move to an entire eight-hour shift on the re-trim position would violate his medical restrictions. This concern is based upon Belhassen's continual assertions that he cannot read, speak or understand English. However, Belhassen apparently has a good understanding of medical restrictions phrased by his doctor in the English language.

This is a mis-characterization of the record which reflects that Morrell regularly used an interpreter to communicate with Belhassen. An interpreter was used at the time Belhassen met with his supervisors to discuss his ability to work the re-trim position for eight hours. It was the supervisor, not Belhassen, who referred to the terminology "medical restrictions."[6] In contrast, Belhassen stated, through an interpreter, that he could not work eight straight hours on the re-trim position. It is also obvious from the record that an interpreter was also used during the DOL hearing.

[¶ 40.] Belhassen has a fifth grade education, which is minimal even in his native Third World country. He can not apply for a commercial driver's license because he reads and writes only Arabic and speaks and understands very little English. While in Libya, Belhassen drove a Toyota "bus" and passenger cars for the military. He never drove a semi-truck.[7] It is against common sense to determine that this experience, coupled with his physical limitations and minimal English skills, provides him with a transferable skill in Sioux Falls. He can not read a map or street signs. Without an interpreter to accompany him, a job as a driver would be improbable. Even if Belhassen could read or speak English, driving a vehicle for a living would be difficult because of his physical limitations. A position requiring him to drive for long periods of time conflicts with his medical restrictions and would inevitably aggravate the existing injury or further injure his back.

[¶ 41.] Ostrander testified that in light of Belhassen's physical condition and his limited education, training and language, his skills as a driver were not transferable. Ostrander concluded that Belhassen was obviously unemployable. He determined that these limitations reduced Belhassen's employability by ninety-five percent and reduced his labor market access by ninety-nine percent. Therefore, Belhassen has clearly established a prima facie case of permanent total disability. The findings of the DOL were clearly erroneous and we should reverse and remand for further determination of whether Morrell satisfied its burden to show that suitable employment is available within Sioux Falls that will accommodate all of Belhassen's limitations.

---

6. Belhassen, through an interpreter, testified: "He [his supervisor, Steve Kiepke] asked me to work on the line eight straight hours. I told him I have note from doctor my back hurt – I can't handle it on the line. He said[,] no[,] you have to do it or you have to go home."

7. The examination of Belhassen, through an interpreter, shows:
   Q: How old was he [Belhassen] when he started driving trucks?
   A: Seventeen
   Q: Okay. What kind of trucks did he drive?
   A: We have like little bus that go to – Toyota.
   Q: Toyota?
   A: Yes.
   Q: Passenger cars?
   A: Yes, sir.
   Q: Did you ever drive a semi-truck?
   A: No. Just little bus.