2004 SD 32

**Benjamin P. LAGGE, Claimant and Appellee,**

v.

**CORSICA CO–OP, Employer and Appellant,**

and

**Travelers Insurance Co., Insurer and Appellant.**

No. 22829.

Supreme Court of South Dakota.

Considered on Briefs Nov. 17, 2003.

Decided March 10, 2004.

Wally Eklund of Johnson, Eklund, Nicholson & Peterson Gregory, South Dakota and Jean M. Massa of Jensen and Massa Winner, South Dakota, Attorneys for appellee.

Sandra Hoglund, Timothy M. Gebhart of Davenport, Evans, Hurwitz & Smith, Sioux Falls, South Dakota, Attorneys for appellants.

GILBERTSON, Chief Justice.

[¶ 1.] Benjamin Lagge was injured while working at the Corsica Co-op. A prior summary affirmance from this Court affirmed his right to workers' compensation from Co-op. Consequently, the Department of Labor held a hearing to determine whether Lagge was permanently and totally disabled. At the hearing, Co-op and their insurance company (Travelers Insurance Company) attempted to enter video surveillance tapes of Lagge into evidence. These tapes had not been disclosed to Lagge, so the Department refused to admit them. The Department also ordered that Lagge is entitled to receive permanent total disability benefits, and ordered Co-op and Travelers to make payments through Lagge's attorney. We affirm.

## FACTS AND PROCEDURE

[¶ 2.] Lagge started working as a mechanic at Co-op in 1987. In early 1988, Lagge was injured while working at Co-op when an overhead garage door malfunctioned and came down on his left shoulder. Lagge saw several doctors because of this accident, including Dr. Dennis Johnson and Dr. Leonard Gutnik. Lagge was twice taken off work because of the injury. In May 1989, Lagge was fired from Co-op because he was no longer able to perform many of his job duties. He had trouble with these duties because his injury made it difficult for him to lift his left arm over his head.

[¶ 3.] Lagge next found work with a contractor. He ran a roller for the contractor, but only for approximately two weeks because the work bothered his neck and shoulders. In June 1989, Lagge began working at Petro Steel. Lagge worked at Petro Steel until December 1990, when he had surgery on his injured shoulder. Petro Steel would not allow Lagge back to work until the doctor gave him a "complete bill of health." Dr. Johnson would not give Lagge a complete bill of health, and consequently, Lagge was terminated from Petro Steel.

[¶ 4.] In June 1991, Lagge filed a petition with the Department of Labor, alleging that while employed by Co-op, he sustained a work-related injury to his left shoulder and was therefore entitled to workers' compensation benefits. Mean-

while, Lagge worked for John Deere until February 1992. He was having difficultly performing this job, so Dr. Gutnik recommended that Lagge try to re-train. As a result, Lagge left John Deere to enroll in an electronics program.

[¶ 5.] This program started in 1991 and ended in 1993. During that time, Lagge did some small engine work out of his home. He also worked thirty or more hours per week for the Douglas County Weed Board during the summer of 1992, and worked for a farmer during the harvest season.

[¶ 6.] After completing his electronics program, Lagge participated in the school's interviewing process. However, he was unable to get a job. Consequently, Lagge started doing some respite care. This was a part-time job, and his hours varied with the number of people he was providing care for. Lagge also continued his small engine repair business.

[¶ 7.] On December 22, 1994, the Department held a hearing on Lagge's 1991 petition. The Department ruled that Lagge's employment activities after he left Co-op contributed independently to his condition. The Department determined that this relieved Co-op of liability under the last injurious exposure rule. Lagge appealed, and the circuit court reversed the Department. This Court affirmed the circuit court without opinion.

[¶ 8.] By early 1997, Lagge's last respite care client went to the nursing home. In 1998, Lagge took a job as a maintenance worker at the nursing home. This job involved lawn mowing on a riding lawn mover, pulling weeds, replacing light bulbs, and repair of wheelchairs and walkers. The nursing home authorized Lagge to work twelve to thirteen hours a week doing this maintenance. Lagge also did light maintenance work and snow removal for four commercial and five residential locations in December 1998.

[¶ 9.] In preparation for the upcoming hearing to determine whether Lagge was permanently and totally disabled, the parties held a prehearing conference. Lagge listed the witnesses he planned to call at the hearing and Co-op and Travelers listed one witness that they intended to call. The Department entered a Prehearing Order including these witnesses and specifically stating that "the parties shall be bound by [the] Order unless objection is made in writing to the Department of Labor and received by September 15th, 1999. No changes will be allowed after that date except in the case of unforeseen exigencies."

[¶ 10.] The hearing took place on June 6, 2000. At the time of the hearing, Lagge was working an average of sixteen to thirty hours per week at the nursing home. He worked nearly forty hours in the week before the hearing. This increase in hours was due to another employee's time off and some remodeling at the nursing home. Lagge was also working up to forty-five hours per week at his own small engine and electronics repair business.

[¶ 11.] At the hearing, Lagge described his job at the nursing home as follows: "Mow lawn. Pull weeds out of flowers. Replace light bulbs. Repair, like wheelchairs. Walkers." On cross-examination, Lagge denied doing any heavy or construction-type work at the nursing home.

[¶ 12.] However, Co-op and Travelers had videotaped surveillance of Lagge. The tapes showed Lagge using both arms in a variety of ways, including constructing a chain link fence, carrying fence posts and a railroad tie, and driving a fence post into the ground. Co-op and Travelers attempted to offer the tapes into evidence, but the Department refused because the tapes and the witnesses related to the tapes had not been disclosed in the Prehearing Order.

In August 2001, the Department awarded Lagge permanent total disability benefits. The circuit court affirmed the Department.

[¶ 13.] Co-op and Travelers appeal, raising the following issues for our review:

1. Whether the Department erred in refusing to receive surveillance videotapes of Lagge.

2. Whether the Department erred in finding Lagge permanently and totally disabled under the odd-lot doctrine.

3. Whether the Department erred in ordering the payment of medical bills through Lagge's counsel.

## STANDARD OF REVIEW

■ [¶ 14.] In workers' compensation cases:

Our standard of review ... is controlled by SDCL 1–26–37. "Under SDCL 1–26–37, when the issue is a question of fact then the clearly erroneous standard is applied to the agency's findings; however, when the issue is a question of law, the actions of the agency are fully reviewable." We will reverse only when, after careful review, we are firmly convinced a mistake has been made.... "The standard of review in an appeal to the Supreme Court from a trial court's appellate review of an administrative decision is de novo: unaided by any presumption that the trial court is correct."

*Capital Motors, LLC, v. Schied,* 2003 SD 33, ¶ 10, 660 N.W.2d 242, 245 (internal citations omitted). "Whether a claimant makes a prima facie case to establish odd-lot total disability inclusion is a question of fact." *Id.* ¶ 11 (citation omitted).

## ANALYSIS AND DECISION

[¶ 15.] **1. Whether the Department erred in refusing to receive surveillance videotapes of Lagge.**

[¶ 16.] At the hearing on June 6, 2000, Lagge testified that the maintenance work he did at the nursing home consisted of: "Mow lawn. Pull weeds out of flowers. Replace light bulbs. Repair, like wheelchairs. Walkers." On cross-examination, Lagge stated that he did not do any "heavy" work or any "construction-type work" at the nursing home. Lagge indicated that the only heavy grounds keeping he did was to "pull weeds in the flowers." He further stated that he intends to continue working for the nursing home.

[¶ 17.] After Lagge rested, Co-op and Travelers called their first witness. To begin their case-in-chief, Co-op and Travelers called two private investigators who had taken surveillance tapes of Lagge. This was offered to refute Lagge's substantive evidence on the extent of his injury.

[¶ 18.] Neither the tapes nor the private investigators had been included in the Prehearing Order. The Prehearing Order required the parties to disclose all of their evidence, including witnesses. In the Order, Co-op and Travelers listed only one live witness that they intended to call.

[¶ 19.] The parties were to be bound by the Prehearing Order unless they objected, in writing, by September 15, 1999. Neither party objected to the Order. Finally, the Order specifically stated that: "No changes will be allowed after that date except in the case of unforeseen exigencies."

[¶ 20.] Co-op and Travelers argued that these were "rebuttal" witnesses. They argued that:

[T]he evidence was offered to impeach [Lagge's] testimony regarding his abilities to use his upper extremities and the type of work he was capable of doing. Had [Lagge] testified forthrightly about his abilities, the impeaching evidence

would never have been used. Yet disclosure of the evidence prior to ascertaining whether it will ever be used defeats its very purpose.

Ultimately, Co-op and Travelers argue that impeachment or rebuttal evidence need not have been disclosed before the hearing.

[¶ 21.] Lagge objected to the admission of the private investigators and the tapes. The Hearing Officer ruled that:

> I guess I don't agree [that they are rebuttal witnesses]. I'm inclined to think that—I mean, I don't think I would place an insidious term upon it, such as trial by ambush, but it does place [Lagge] in the posture of not having the opportunity to prepare a defense against matters being presented in the hearing today. It was never identified in the pre-hearing conference or otherwise. Granted it is our practice not to require the identification of rebuttal witnesses, but I do not consider this type of testimony now being presented to be rebuttal testimony.
>
> Pain is an element of a claim for permanent total disability benefits. More than beyond the issue of credibility, it's a factual matter that has to be decided by me in an element which an insurer would anticipate it would have to defend in a matter of this type. I will therefore rule the objection is sustained and that this witness will not be permitted to testify.

[¶ 22.] Co-op and Travelers cite several cases for the proposition that surveillance tapes are admissible to impeach a claimant's testimony. The question in this case is not whether the surveillance tapes are admissible; rather, the question is whether Co-op and Travelers can offer the evidence in violation of the Prehearing Order requiring pre-disclosure from both sides. In only one of the cases cited by Co-op and

Travelers was prior notice of the tapes an issue. However, in that case, a discovery rule provided that "impeachment witnesses, and rebuttal witnesses thereto, need not be revealed." *Calleyro v. Mt. Sinai Med. Ctr.*, 554 So.2d 1208, 1209 (Fla. App.1990). The Prehearing Order in the instant case included no such exception.

[¶ 23.] Furthermore, most jurisdictions hold both the existence and contents of surveillance tapes to be freely discoverable. "Most courts addressing this issue have held that a party in possession of a surveillance video tape must disclose it to the opposing party prior to trial." *Roundy v. Staley*, 1999 UtApp 229, ¶ 9, 984 P.2d 404, 407 (citing *Martino v. Baker*, 179 F.R.D. 588, 589 (D.Colo.1998)). That court went on to note that:

> For example, in *Samples v. Mitchell*, 329 S.C. 105, 495 S.E.2d 213 (App.1997), the defendant in a personal injury case offered a surveillance video tape of the plaintiff at trial after failing to disclose the tape in his answers to plaintiff's discovery requests. *See id.* at 214. In holding that the trial court erred in admitting the tape, the appellate court noted, "This question seems to arise most often when the defendant in a personal injury case has videotaped or collected some other visual evidence of the plaintiff after the accident to impeach the plaintiff on the extent of his or her injuries. *Discovery of the evidence is generally permitted.*" *Id.* at 215 (quoting *6 James Wm. Moore et al., Moore's Federal Practice* 26.41(4)(b) (3d ed.1997)).

*Id.* (emphasis added). In the event that a party is concerned that a claimant will conform their testimony to fit the videotape, the Department could allow an employer/insurer to depose the claimant prior to turning over the tape. *See Shenk v.*

*Berger,* 86 Md.App. 498, 587 A.2d 551 (1991).

[¶ 24.]Finally, we note that Co-op and Travelers had almost a year from the time of the Prehearing Order to the time of the hearing itself in which they could have made a motion to the Department to amend the Prehearing Order to include the private investigators and videotapes. "Discovery rules are designed 'to compel the production of evidence and to promote, rather than stifle, the truth finding process.'" *Dudley v. Huizenga,* 2003 SD 84, ¶ 11, 667 N.W.2d 644, 648. The Workers' Compensation Act is intended to provide injured employees a remedy that is expeditious and relatively inexpensive. *Harn v. Continental Lumber Co.,* 506 N.W.2d 91, 95 (S.D.1993). Allowing Co-op and Travelers to present evidence that was not disclosed in the Prehearing Order would contradict those intentions.

[¶ 25.] The Department did not abuse its discretion in refusing to admit evidence not disclosed in the Prehearing Order. Co-op and Travelers's choice to present the witnesses and the tapes without prior disclosure was a violation of the Prehearing Order. Exclusion of that evidence was within the discretion of the Department.

[¶ 26.] **2. Whether the Department erred in finding Lagge permanently and totally disabled under the odd-lot doctrine.**

[¶ 27.] Whether Lagge is entitled to permanent total disability benefits under the odd-lot doctrine is a question of fact. *Capital Motors,* 2003 SD 33, ¶ 11, 660 N.W.2d at 246. We apply the clearly erroneous standard to the Department's findings of fact. "[T]herefore, we will overturn fact findings only when we are definitely and firmly convinced a mistake has been made." *Lakota Community*

*Homes, Inc. v. Randall,* 2004 SD 16, ¶ 9, 675 N.W.2d 437, 440 (citation omitted).

[¶ 28.] The determination of whether Lagge is entitled to permanent total disability benefits, also known as odd-lot disability benefits, is made as follows:

[A] person is totally disabled if his physical condition, in combination with his age, training, and experience, and the type of work available in his community, causes him to be unable to secure anything more than sporadic employment resulting in insubstantial income. Under this doctrine, an employee first bears the burden to show total disability. If it is "obvious" an employee falls within the "odd-lot" category, the employer must then prove positions in the community are available for persons with the employee's limitations. A claimant may show "obvious unemployability" by: (1) showing that his physical condition, coupled with his education, training and age make it obvious that he is in the odd-lot total disability category, or (2) persuading the trier of fact that he is in fact in the kind of continuous, severe and debilitating pain which he claims. Inversely, if the employee is not obviously unemployable, the burden remains with the employee to demonstrate the unavailability of suitable employment, after reasonable albeit unsuccessful, efforts to find work.

*Belhassen v. John Morrell & Co.,* 2000 SD 82, ¶ 13, 613 N.W.2d 531, 535. Lagge did not argue that he was "obviously unemployable." Therefore, the only issue is whether he is "unable to secure anything more than sporadic employment resulting in insubstantial income." *Id.*

[¶ 29.] Co-op and Travelers argue that because Lagge has been employed since his injury, he was not permanently and totally disabled. They assert that Lagge has worked steadily, and therefore is not

"sporadically" employed. They further argue that Lagge failed to engage in a reasonable job search. Finally, they argue that their expert showed that suitable employment was available for Lagge.

[¶ 30.] Lagge points out, however, that their argument ignores the "insubstantial income" part of the law and provides a strained analysis of "sporadic." The Department, in fact, rejected Co-op and Travelers' argument, stating: "The Department holds that Employer/Insurer's reading of the term 'sporadic' in the context of an Odd Lot case is too narrow. Using that interpretation, any employment which was held regularly and continuously would meet the standard, even though its earnings were not 'substantial.' " The Department found that Lagge earned "nothing in some years, depending on his wife for support, and after losing his job at Petro Steel, never earned more than half his pre-injury earnings (not even factoring inflation)."

[¶ 31.] Co-op and Travelers assert that the Department's reliance on Lagge's tax returns was an improper method to make a determination of insubstantial income. In *Davis v. Knippling,* 1998 SD 31, 576 N.W.2d 525, income tax returns were admitted into evidence for use in determining plaintiff's lost earning capacity attributable to his injuries. *Id.* ¶¶ 15–17. We see no error in the Department's use of Lagge's tax returns.

[¶ 32.] In awarding Lagge permanent total disability benefits, the Department made the following findings of fact:

31. [Lagge] testified credibly about the impact his injury has had on his ability to work.

32. The testimony of [Lagge's] vocational expert (Ostrander) that because of his injury and his resulting physical condition [Lagge] cannot obtain suitable employment given his, physical condition, education, training and age are adopted.

33. The employment obtained by [Lagge] since his injury has been sporadic and has resulted in earnings that are not and have not been substantial. This is also true with respect to employment that is available in the Corsica, SD area.

34. [Lagge] has demonstrated that he is motivated to find work and maintain employment.

35. [Lagge] demonstrated that he made more than reasonable and persistent efforts to locate prospective employers, inquire about available jobs and pursue job leads.

36. [Co-op and Travelers's] evidence fails to demonstrate that there are specific positions, which are regularly and continuously available and actually open in [Lagge's] community for persons with [Lagge's] limitations.

37. [Co-op and Travelers's] vocational expert opined that substantial/gainful employment is (and was) available to [Lagge]. Such opinion did not take into account the actual cost [and] expense of commuting to work for the jobs identified in Mitchell, SD (which would have the effect of reducing the real wage to $3.96 per hour and in some instances the jobs identified by [Co-op and Travelers's] expert no wages or salaries were identified. The opinions of [Co-op and Travelers's] expert are not well grounded in reason or fact and are rejected.

38. [Lagge] had, prior to the time of the labor market survey of [Co-op and Travelers's] expert, applied for jobs similar to those identified at the hearing at the State Training School at Plankinton, Weber Implement in Parkston, VanDerWerff Implement at Platte, and at Rav-

en Industries at Parkston, SD. He was not successful in obtaining employment.

40. [Lagge] has demonstrated his entitlement to "odd-lot" benefits for permanent and total disability.

We first note that "[d]etermining the credibility of the witness is the role of the factfinder. Where the [Department] has resolved conflicts in evidence we cannot change its findings." *Schneider v. South Dakota Dept. of Transportation*, 2001 SD 70, ¶ 14, 628 N.W.2d 725, 730 (citation omitted). Furthermore, a review of the record supports the Department's findings. Based upon the record, the Department's finding that Lagge established that he is entitled to odd-lot benefits is not clearly erroneous.

[¶ 33.] 3. **Whether the Department erred in ordering the payment of medical bills through Lagge's counsel.**

[¶ 34.] The Department ordered Co-op and Travelers to pay Lagge $680 to reimburse him for a prescription drug bill. Co-op and Travelers were also ordered to pay the amounts billed by Dr. Gutnik and future amounts incurred for medical treatment and prescriptions related to his injury. Finally, the Department ordered that "sums currently owed shall be paid through [Lagge's] counsel."

[¶ 35.] Co-op and Travelers, however, contend that they should be allowed to pay Lagge's medical providers directly. Co-op and Travelers do not contest their responsibility to pay the medical expenses causally related to Lagge's injury. Rather, they wish to pay Lagge's providers directly, with no third-party involvement. Furthermore, Co-op and Travelers point out that Travelers did not refuse to make reimbursement for Lagge's prescription expense. Instead, Travelers asked Lagge to provide better itemization of his prescription bills.

[¶ 36.] SDCL 62–4–1,[1] our statute concerning medical expenses, is silent on how a claimant's medical expenses should be paid. The statute requires an employer to provide necessary medical care, but does not specify to whom payment for that care should be made. Therefore, the Department's order is not in violation of the statute.

[¶ 37.] Co-op and Travelers cite Larson's Workers' Compensation Law section 94.02[11] for the proposition that "[t]he normal rule is that the obligation to pay medical bills runs from the employer to the physician or hospital." This rule was

---

1. SDCL 62–4–1 provides:

The employer shall provide necessary first aid, medical, surgical, and hospital services, or other suitable and proper care including medical and surgical supplies, apparatus, artificial members, and body aids during the disability or treatment of an employee within the provisions of this title. Repair or replacement of damaged prosthetic devices is compensable and is considered a medical service under this section if the devices were damaged or destroyed in a work related accident. Repair or replacement of damaged hearing aids, dentures, prescription eyeglasses, eyeglass frames, or contact lenses is considered a medical service under this section if the hearing aids, dentures, prescription eyeglasses, eyeglass frames, or contact lenses were damaged or destroyed in an accident which also causes another injury which is compensable under this law. The employee shall have the initial selection to secure the employee's own physician, surgeon, or hospital services at the employer's expense. If the employee selects a health care provider located in a community not the home or workplace of the employee, and a health care provider is available to provide the services needed by the employee in the local community or in a closer community, no travel expenses need be paid by the employer or the employer's insurer.

used by the Connecticut Supreme Court in construing a statute that required employers to provide necessary medical care without specifying to whom payment should be made. *Pokorny v. Getta's Garage*, 219 Conn. 439, 594 A.2d 446 (1991). That court held:

> The statute does not speak in terms of payment to the employee of the medical expenses incurred, but rather is limited to providing that the employee will receive necessary medical care at the expense of the employer, thereby establishing a direct relationship between, on the one hand, the employer and its workers' compensation carrier, and, on the other hand, the medical care provider.

*Id.* at 454–55.

[¶ 38.] However, this authority is not binding. The Department's order is not in contravention with any statute. Furthermore, payment through a claimant's attorney is commonly done and is contemplated by statute. SDCL 62–7–36[2] states that attorney's fees are a percentage of compensation benefits, which include medical expenses. Paying medical expenses directly to the medical care provider could deprive Lagge's attorneys of the percentage of "compensation benefits" they are entitled to pursuant to the statute. *See Stanton v. Hills Materials Co.*, 1996 SD 109, ¶ 20, 553 N.W.2d 793, 797 (Gilbertson, J., concurring) (noting that "[i]f attorneys are denied fees for work prosecuted on behalf of an injured work[er], there would be a chilling effect upon the ability of an injured party to obtain adequate representation"). The Department did not err in requiring Co-op and Travelers to pay for Lagge's medical care through his counsel.

[¶ 39.] Affirmed.

[¶ 40.] SABERS, KONENKAMP, and MEIERHENRY, Justices, concur.

[¶ 41.] ZINTER, Justice, deeming himself disqualified, did not participate.

---

2. SDCL 62–7–36 provides:

Except as otherwise provided, fees for legal services under this Title shall be subject to approval of the department.

Attorneys' fees may not exceed the percentage of the amount of compensation benefits secured as a result of the attorney's involvement as follows:

(1) Twenty-five percent of the disputed amount arrived at by settlement of the parties;

(2) Thirty percent of the disputed amount awarded by the department of labor after hearing or through appeal to circuit court;

(3) Thirty-five percent of the disputed amount awarded if an appeal is successful to the Supreme Court.

Attorneys' fees and costs may be paid in a lump sum on the present value of the settlement or adjudicated amount.